391 A.2d 84.

FIREMAN'S FUND INSURANCE COMPANY *v.*
LOLA-JANE MCALPINE, *Administratrix.*

JAY K. ROGERS *v.* ALFRED C. TOEGEMANN *et al.*

WILLIAM J. BOYES, JR., *p.p.a.* WILLIAM J. BOYES *v.*
UNITED TRUCK AND BUS SERVICE CO. *et al.*

WILLIAM J. BOYES, JR., *p.p.a.* WILLIAM J. BOYES
*v.* HELEN I. MARTIN *et al.*

AUGUST 17, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J. In each of the above proceedings we have issued our common law writ of certiorari so that we may discuss the extent to which a litigant is immunized from discovery procedures by Super. R. Civ. P. 26(b). Each petition seeks review of an interlocutory order of the Superior Court granting a motion to compel the production of various materials in the possession of the petitioner. Three of the petitions originated in negligence actions and raise a common issue: whether written statements of witnesses taken by the petitioners' insurers are subject to discover under Super. R. Civ. P. 34. The fourth petition relates to a probate appeal now pending in the Superior Court and concerns a demand

for information, some of which involves communications between the petitioner and its counsel.

Before proceeding to examine the individual petitions, a brief review of the pertinent rules is in order. Our starting point is Rule 34, which provides the mechanism by which a party to a civil action may seek the production, for the purposes of inspection or copying, or writings, documents, photographs, and other data compilations that are in the possession of his adversary. The right to secure such material is not unlimited but is expressly made subject to the restrictions delineated in Rule 26(b).

This latter proviso delineates different limitations upon a party's access to matters possessed by another party. Rule 26(b)(1) states that discovery will be allowed as to "any matter, not privileged, which is relevant to the subject matter involved in the pending action * * *." Thus, discoverable matter must be both relevant and not privileged. In this context, the term "privileged" denotes the recognized exclusions found in the law of evidence, such as those related to the attorney-client or the husband-wife relationship. 1 Kent, *R.I. Civ. Prac.* §26.11 at 220 (1969).[1]

Rule 26(b)(2) sets forth three additional limitations upon the scope of discovery under Rule 34. Unless a party can demonstrate "injustice or undue hardship," he will be precluded from obtaining a "writing obtained or prepared by the adverse party, his attorney, surety, indemnitor, or agent in anticipation of litigation and in preparation for trial * * *." Furthermore, absolute immunity from discovery is provided for a "writing which reflects an attorney's mental impressions, conclusions, opinions, or legal theories * * *."

---

[1]A similar construction has been placed upon the federal counterpart of Super. R. Civ. P. 26(b). *Carl Zeiss Stiftung* v. *V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318 (D. D.C. 1966), *aff'd sub nom V.E.B. Carl Zeiss, Jena* v. *Clark*, 384 F.2d 979, 128 U.S. App. D.C. 10, *cert. denied* 389 U.S. 952, 88 S. Ct. 334, 19 L. Ed. 2d 361 (1967); *Campbell* v. *Eastland,* 307 F.2d 478 (5th Cir. 1962), *cert. denied* 371 U.S. 955, 83 S. Ct. 502, 9 L. Ed. 2d 502 (1963).

These restrictions represent a somewhat modified version of the work-product doctrine first enunciated in *Hickman* v. *Taylor*, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947). The final limitation found in Rule 26(b)(2) is that "conclusions of an expert engaged in anticipation of litigation and in preparation for trial" are immune from discovery unless the court orders production to avoid injustice or undue hardship. *Town of North Kingstown* v. *Ashley*, 118 R.I. 505, 374 A.2d 1033 (1977).

Although our Rule 26(b)(2) protects writings made "in anticipation of litigation and in preparation for trial," we do not believe that the drafters ever intended the rule to be construed so that a litigant's immunity from discovery would be lost unless he could show that the documents in his possession were obtained not only in anticipation of litigation but also as part of his trial preparation. If the rule is construed literally, a party who without any warning suddenly finds himself immersed in litigation and then seeks the help of an expert could be forced to divulge the expert's report to his adversary because, even though the report was made in preparation for trial, its formulation could not be said to be a pre-litigation maneuver. In the past, when called upon to determine whether we should substitute the disjunctive "or" for the conjunctive "and," this court has emphasized that it would not allow itself to be blindly enslaved to a literal reading of a statute or an ordinance when to do so would defeat or frustrate the intendment of the Legislature. *Town of Scituate* v. *O'Rourke*, 103 R.I. 499, 239 A.2d 176 (1968). In the *Scituate* case we read "and" as "or" and we shall do the same here. *See* 1 Kent, *R.I. Civ. Prac.* §26.14 at 225 n.47 (1969). We think it quite obvious that the protective ambit of Rule 26(b)(2) was not meant to be restricted to material that had been prepared subsequent to the initiation of litigation. On the contrary, in our opinion, the rule was meant to be applied to materials gathered when litigation is merely a contingency. Thus, the rule's privilege may be invoked for

materials prepared either in anticipation of litigation or for trial.

With the above principles as a backdrop, we can proceed to our discussion of their application to the pertinent facts of the petitions. We begin our analysis with the three civil actions.

*Rogers* v. *Toegemann et al.*, No. 76-226-M.P., is a personal injury action arising out of a five-car chain collision that occurred on November 15, 1974. Rogers was the operator of the second vehicle in a line of vehicles that were stopped in Warwick in the southbound speed lane of Interstate Route 95. While he was stopped, Rogers alleges that he was hit by the car in back of him driven by Alan P. Durand. The impact caused him to tap the car in front of him driven by Susan A. Keegan. Within seconds, Rogers' vehicle was hit once again from the rear. It appears that two other vehicles had collided with the Durand car, forcing it into the Rogers automobile. The car immediately behind Durand was driven by Alfred C. Toegemann and owned by Amica Services, Inc. (Amica). The last vehicle in the chain was driven by Edward W. Graziano.

Rogers filed suit in the Superior Court on July 3, 1975 against Durand, Toegemann, Amica, and Graziano. Through interrogatories propounded to Toegemann and Amica, Rogers learned that shortly after the collision an investigator for their insurer had investigated the mishap and taken written statements from Durand, Graziano, and Keegan. These statements, which were obtained in late 1974 and early 1975, were in possession of Toegemann and Amica's attorney at the time suit was commenced. Rogers thereafter served upon Toegemann and Amica a request for the production of 13 items, including three statements secured by the insurance investigator. Objection was raised to all matters contained in Rogers' request, and Rogers then filed the appropriate motion to compel production under Super. R. Civ. P. 37.

After a hearing, the trial justice sustained Toegemann's and Amica's objection to the material Rogers sought access to except for four items, three of which were the statements obtained by the investigator. Toegemann and Amica's petition challenges the order directing the production of the statements.

The next two petitions arose out of an incident that occurred on October 31, 1974 in Warwick. William J. Boyes, Jr., was returning from school on a bus owned by United Truck & Bus Service Co. (United). Near the Apponaug School on Centerville Road, the bus pulled to the curb, came to a stop, and discharged William, who then proceeded to pass in front of the bus to cross the road. When he stepped from the side of the bus, he was struck by a vehicle driven by Helen I. Martin. On July 9, 1976, William's father commenced a suit in his own behalf and in behalf of his son against United and Martin. United is charged with being negligent in that (1) it failed to properly maintain the school bus and (2) its driver had neglected to inspect the flashing lights, failed to activate the lights when discharging William, and had left William at an unscheduled stop near a dangerous intersection. Martin's negligence is based upon her alleged noncompliance with the terms of G.L. 1956 (1968 Reenactment) §31-20-12 (stopping for a school bus whose red lights are flashing) and her failure to maintain proper control of her vehicle.

Once Mr. Boyes received the replies to his interrogatories, he discovered that shortly after his son was injured, investigators for United's and Martin's insurers had taken written statements from several witnesses, and these statements were in the possession of defendants' attorneys. Subsequently, United and Martin were ordered to produce the statements, and we then issued our writ.

At the outset we can quickly dispose of any claim that since the copies of the witnesses' statements were in the possession of attorneys for petitioners, they were protected from disclosure

by reason of the attorney-client privilege incorporated into Rule 26(b)(1). A document that is subject to discovery in the hands of a party or his agent does not become immunized from discovery under Rule 26(b)(1) simply by delivery to his lawyer. *Balistrieri* v. *O'Farrell,* 57 F.R.D. 567 (E.D. Wis. 1972); 1 Kent, *R.I. Civ. Prac.* §26.11 at 221 (1969); 8 Wright and Miller, *Federal Practice and Procedure* §2017 at 138-39 (1970).

The dispositive issue in Toegemann's, Amica's, United's, and Martin's petitions is whether the witnesses' statements come within the protective pale of Rule 26(b)(2) and especially that part of the rule providing for the qualified privilege of "any writing obtained or prepared by the adverse party, his attorney, surety, indemnitor, or agent" in anticipation of litigation or in preparation for trial. If petitioners are correct in their contention that they do, the burden was upon the party requesting production to demonstrate that his access to the statements was necessary to avoid "injustice or undue hardship.

The Rhode Island cases which have dealt with Rule 26(b)(2) provide little guidance in determining if the written statements qualify as protected writings under the rule. However, Fed. R. Civ. P. 26(b)(3), despite slight differences in language, is similar in effect to our Rule 26(b)(2), and we will look to the federal courts for assistance. *Nocera* v. *Lembo,* 111 R.I. 17, 298 A.2d 800 (1973).[2]

The federal courts have not settled upon a single position regarding the discoverability of reports prepared by a party's insurer. The majority of cases hold that unless the insurer's investigation has been precipitated at the request or under

---

[2]Prior to its amendment in 1970, Fed. R. Civ. P. 26(b) did not provide for the immunization from discovery of materials obtained or prepared by a non-attorney. The 1970 amendments to the federal rules have made documents and tangible things obtained or prepared by a party's representative or agent likewise beyond the scope of the discovery process. *See* 8 Wright and Miller, *Federal Practice and Procedure* §2024 at 204-07 (1970).

the guidance of counsel, the investigation is conclusively presumed to have been made in the ordinary course of business and not in anticipation of litigation or preparation for trial. *Mc Dougall* v. *Dunn*, 468 F.2d 468 (4th Cir. 1972); *Fletcher* v. *Meserve*, 20 F.R. Serv. 2d 202 (D. Mass. 1975); *Atlanta Coco-Cola Bottling Co.* v. *Transamerica Insurance Co.*, 61 F.R.D. 115 (N.D. Ga. 1972); *Thomas Organ Co.* v. *Jadranska Slobodna Plovidba*, 54 F.R.D. 367 (N.D. Ill. 1972); *Universal Venders, Inc.* v. *Candimat Co. of America*, 16 F.R. Serv. 2d 1329 (E.D. Pa. 1972).[3]

Although these courts recognized that the potential for litigation is always a possibility on the horizon with insurers, they assert that it is not until an attorney is called upon the scene to direct that certain information be obtained because of the imminent threat of litigation that it can be said that an insurer has acted in anticipation of litigation. The mere contingency of litigation sometime in the future is not sufficient under Rule 26(b) to be "in anticipation of litigation." A contrary position would, according to the court in *Thomas Organ Co.*, "be a foreclosure of discovery of almost all internal documents of insurance companies relating to the claims of insureds." 54 F.R.D. at 373.

The majority approach has been criticized as contrary to the wording and intent of the 1970 amendments to Rule 26(b). 4 Moore, *Federal Practice* ¶26.64[3] at 64 (1977-78 Cum. Supp.). Both the Rhode Island and federal rules clearly do not require the intervention of an attorney to vest writings obtained or prepared by a party's representative with the qualified privilege granted under the rules. While both rules mandate that the writings be made "an anticipation of litigation," we do not feel that this requirement can only be satisfied when an attorney had been engaged to oversee the compilation of relevant data.

---

[3]This view has also been adopted by the courts of Delaware. *Conley* v. *Graybeal*, 315 A.2d 609 (Del. Super. 1974); *Brandywine Shoppe, Inc.* v. *State Farm Fire & Casualty Co.*, 307 A.2d 806 (Del. Super. 1973).

We must concede that it is difficult to draw the line between materials prepared by an insurer in anticipation of litigation and those prepared in the ordinary course of the insurer's business. One court has suggested as a solution to the problem that a case-by-case approach be adopted. *Spaulding v. Denton,* 68 F.R.D. 342 (D. Del. 1975). We do not feel, however, that this is a satisfactory response since it provides for no uniformity in the manner in which the issue is resolved in the lower tribunals.

Another view, and the one to which we subscribe, is found in *Almaguer* v. *Chicago, Rock Island & Pacific R.R.,* 55 F.R.D. 147 (D. Neb. 1972).[4] There a railroad employee had been injured on the job, and the company's insurer conducted an investigation shortly after the incident. The court held that

"statements taken by a claim agent immediately after an accident are taken in anticipation of litigation. * * * The anticipation of the filing of a claim against a railroad when a railroad employee has been injured or claims to have been injured on the job, is undeniable, and the expectation of litigation in such circumstances is a reasonable assumption." 55 F.R.D. at 149.

This statement is of equal validity when the mishap involves an automobile. In our litigious society, when an insured reports to his insurer that he has been involved in an incident involving another person, the insurer can reasonably anticipate that some action will be taken by the other party. The seeds of prospective litigation have been sown, and the prudent party, anticipating this fact, will begin to prepare his case. *See* 8 Wright and Miller, Federal Practice and Procedure, §2024 at 198 (1970). Although a claim may be

---

[4]*See also Hamilton* v. *Canal Barge Co.,* 395 F. Supp. 975 (E.D. La. 1974), where the fact that an insurance company investigated a claim on the day it happened was thought to raise no question but that it was "prepared in anticipation of litigation."

settled short of the instigation of legal action, there is an ever-present possibility of a claim's ending in ligitation. The recognition of this possibility provides, in any given case, the impetus for the insurer to garner information regarding the circumstances of a claim.

We do not mean to imply, however, that under no circumstances can an insurer be deemed to conduct an investigation of a claim in the ordinary course of its business. In many cases an insurer may prepare reports for a purpose other than in response to the threat of litigation. For example, in *Nordeide* v. *Pennsylvania Railroad Co.*, 73 N.J. Super 74, 179 A.2d 71 (1962), the plaintiff alleged that railroad employees knocked him unconscious and threw him on the tracks. While still unconscious, a train ran over him, severing both his legs. The court permitted discovery of an investigation report taken the day after the incident on the ground that such a document was routinely prepared as required by the Interstate Commerce Commission. Obviously, the report was not made in expectation of litigation, and consequently it did not come within the rule.

Since we find that the statements taken by petitioners' investigators are entitled to the qualified privilege of Rule 26(b)(2), the burden was upon respondents to show that "a denial of production or inspection will result in an injustice or undue hardship." The determination of this issue is vested in the sound discretion of the trial justice, who should look at the facts and circumstances of each case in arriving at an ultimate conclusion. *Southern Railway Co.* v.*Lanham*, 403 F.2d 119 (5th Cir. 1968); *Tiedman* v. *American Pigment Corp.*, 253 F.2d 803 (4th Cir. 1958).

The record before us is silent as to what Rogers or Boyes presented to the courts below as the circumstances demonstrating that the statements were necessary to prevent injustice or undue hardship. Also absent from the record is any indication of the circumstances upon which the trial justice relied in ordering the production of the witnesses' statements

possessed by the investigators. Before this court Rogers and Boyes argue that the mere lapse of time from when the statements were obtained to when their existence became known is, in and of itself, sufficient to constitute undue hardship under the rule. In support of this contention, they direct our attention to a number of federal cases which hold that statements taken from eyewitnesses shortly after an event are unique catalysts in the search for truth in that they provide an immediate impression of the facts, the substantial equivalent of which cannot be recreated or duplicated by a deposition or interview months or years after the event. The unique quality of such statements has been determined to provide special circumstances satisfying the undue hardship requirement.[5] *McDougall* v. *Dunn,* 468 F.2d 468 (4th Cir. 1972); *Southern Railway Co.* v. *Lanham,* 403 F.2d 119 (5th Cir. 1968); *Teribery* v. *Norfolk & Western Railway,* 68 F.R.D. 46 (W.D. Pa. 1975); *Tiernan* v. *Westext Transport Inc.,* 46 F.R.D. 3 (D. R.I. 1969); *Johnson* v. *Ford,* 35 F.R.D. 347 (D. Colo. 1964); *DeBruce* v. *Pennsylvania R. Co.,* 6 F.R.D. 403 (E.D. Pa. 1947); *Tinder* v. *McGowan,* 15 F.R. Serv. 2d 1608 (W.D. Pa. 1970).[6]

However, these cases afford no support for the lapse-of-time argument presented by Rogers and Boyes. The cases to which they allude refer to the lapse which occurs between the mishap and the taking of a statement, while the lapse relied on by Rogers and Boyes concerns the period between the taking of a statement and the awareness that a statement has been procured by the other party's insurer. Furthermore, with the exception of *McGowan* and *Westext Transport Inc.*,

---

[5]The Advisory Committee's Note to amended Fed. R. Civ. P. 26 also supports this proposition: "The analysis of the court suggests circumstances under which witness statements will be discoverable. The witness may have given a fresh and contemporaneous account in a written statement while he is available to the party seeking discovery only a substantial time thereafter." 48 F.R.D. 501. *See also* 1 Kent, *R.I. Civ. Prac.* §26.14 at 227 (1969).

[6]*Contra, Fidelity & Deposit Co.* v. *S. Stefan Strauss, Inc.,* 52 F.R.D. 536 (E.D. Pa. 1971); *Stamatakos* v. *Hunter Shipping Co.,* 49 F.R.D. 23 (E.D. Pa. 1969).

the eyewitnesses' statements were made within a day or two of the contested event. The courts were careful to emphasize that it was the proximity of the making of the statement to the particular incident which gave the statements their unique value. They provided an immediate impression of the facts, an on-the-spot account, as it were, which can never really be recreated by other means. *DeBruce* v. *Pennsylvania R. Co.*, 6 F.R.D. at 406. Thus, in *Hamilton* v. *Canal Barge Co.*, 395 F. Supp. 975 (E.D. La. 1974), the court stated, in ordering the production of five eyewitness statements taken on the day of the accident:

> "It is important to note, however, that mere lapse of time should normally be enough to require production only of statements given at almost the same time as the accident. Were a statement given a week, or two weeks, after the accident at issue, the court might well require counsel to demonstrate * * * that the witness was not available for deposition without undue hardship." 395 F. Supp. at 978.

Looking now to the individual requests made by Rogers and Boyes, application of the above principle easily disposes of most of the disputed requests. The statements which Rogers sought access to in the files of Toegemann's and Amica's insurers cannot be viewed as being made either immediately after or nearly contemporaneous with the chain collision on the interstate. Alan Durand was the first to be interviewed by the insurance investigator. This took place on November 29, 1974, a full 2 weeks after the collision. The statements from Graziano and Keegan bear dates of December 5, 1974 and January 4, 1975, respectively. The time lag between the collision and each of the witnesses' statements demonstrates that these are not the almost-contemporaneous eyewitness accounts that are discoverable with a further showing.

Likewise, of six Boyes requests from United, two statements were taken approximately 11 months after the young schoolboy was injured, a third was given over 14 months

BEVILACQUA, C.J. These are two separate appeals, arising from a divorce action, which have been consolidated for the purposes of oral argument. In the first case the husband appeals from a judgment citing him in contempt for failure to make support payments mandated by the original decree of divorce. In the second case the wife appeals from a subsequent order permitting the husband to purge himself of contempt, by payment of some but not all the arrearages, and terminating support for a child who at the time had reached the age of 18 but was not yet 21.

On November 9, 1967, a final divorce decree was entered in the Family Court in Newport terminating the marriage of Peter and Eleanor Calcagno. Both parties were Rhode Island residents at the time of the filing of the divorce petition and at the time of the entry of the final decree. In the final decree, Eleanor was awarded custody of the parties' three minor children and Peter was ordered to pay the sum of $75 per week for support of said children.

On June 3, 1974, Eleanor filed a petition in the Family Court in Newport alleging that Peter was $6,400 in arrears relative to the support payments and requesting the court to adjudge him in contempt. Peter was personally served with a contempt citation at his residence in New Jersey by a sheriff of said state. The citation directed him to appear in Family Court on June 28, 1974 to show cause why he should not be cited for contempt.

Peter responded by letter, dated June 21, 1974 to the clerk of the Family Court, wherein he reserved his right to dispute the court's jurisdiction and denied that he was delinquent in his support payments since he had unilaterally reduced said payments by $25 per week per child as each child became emancipated. A copy of the letter was returned to Peter with a notation informing him that support could only be reduced pursuant to a court order and advising him to obtain legal assistance.

Peter failed to appear in Family Court on June 28, 1974,

and was thereupon adjudged in contempt for failure to make payments in the amount of $6,600. On July 19, 1974, an order directing him to appear and to purge himself before the issuance of a capias for his arrest was entered. Eleanor's attorney mailed a copy of this order to him by certified mail.

Peter took no further action until August 23, 1976, on which date he filed a petition to set aside the judgment entered on June 28, 1974[1] and requested a permanent injunction to preclude Eleanor from attaching his wages under 42 U.S.C.A. 659. A hearing was held on October 7, 1976 and, 3 weeks later on October 28, 1976, an order was entered denying his petition for failure to comply with G.L. 1956 (1969 Reenactment) §9-21-2, and decreeing that the Family Court had jurisdiction over the subject matter and the person at the time its order was entered on June 28, 1974. The foregoing facts comprise the basis of Peter's appeal.

On January 3, 1977, Eleanor filed an additional petition to cite Peter in contempt for arrearages stemming from the period subsequent to the original judgment entered June 28, 1974. She alleged arrearages in the sum of $6,200 from July 1974 through December 1976. Peter responded by filing a petition to amend the support provisions of the original divorce decree. The court treated petitions as motions and on June 16, 1977, granted Peter's motion to terminate the support payments on the grounds that all three children were either emancipated or had attained the age of majority. Additionally, the court adjudged Peter in contempt for failure to make support payments totaling $14,778 and directed him to purge himself by making support payments in the amount of $12,400 pursuant to a court formulated schedule. Eleanor filed a notice of appeal from this decree.

## A

We shall initially address the three issues raised in Peter's appeal:  (1) whether the Family Court, after entry of a final

---

[1]The petition erroneously requests that the judgment of June 28, 1976 be voided.

decree, retains personal jurisdiction over a non-resident respondent; (2) whether support payments to children of parties terminate when a child becomes emancipated; and (3) whether the Family Court justice erred in denying respondent's petition to set aside the entry of judgment for failure to comply with §9-21-2.

I

The first issue focuses on the time period subsequent to the entry of the final decree. After the entry of the final decree, Peter left Rhode Island, remarried, and became a permanent resident of New Jersey. In the instant case, he argues that because he was a resident of a foreign jurisdiction at the time Eleanor filed her petition citing him in contempt, the Family Court lacked jurisdiction over him. He does not contest the validity of the final decree since he was a Rhode Island resident at the time it was entered.

Two essential elements of a valid judgment are that the court have jurisdiction of the subject matter and of the parties whose rights are to be adjudicated. *Lamarche v. Lamarche*, 115 R.I. 472, 474, 348 A.2d 22, 23 (1975). Additionally, a valid judgment cannot be entered against an individual unless he has received adequate notice and has been afforded an opportunity to be heard. *Id.* at 474, 348 A.2d at 23. In the case at bar Peter was personally served by a New Jersey sheriff and was ordered to appear in Family Court to show why he should not be adjudged in contempt for his failure to make support payments pursuant to the terms of his divorce decree. We believe that he was sufficiently apprised of the contempt proceeding and was afforded to opportunity to be heard.

As we have said many times, the Family Court is one of statutory creation possessing only those powers specifically conferred upon it by the Legislature. *Brandt v. Brandt*, 119 R.I. 607, 609, 381 A.2d 1047, 1048 (1978); *Tetreault v. Tetreault*, 119 R.I. 611, 613, 381 A.2d 1049, 1050 (1978); *Castellucci v. Castellucci*, 116 R.I. 101, 105, 352 A.2d 640, 643 (1976). The court's jurisdiction of the subject matter here

in question is outlined in §15-5-16. The pertinent part of this statute reads:

> "The * * * [Family] [C]ourt may regulate the custody and provide for the education, maintenance, and support of children of all persons by it divorced * * * and the court may make all necessary orders and decrees concerning the same and the same *at any time* may alter, amend, and annul for sufficient cause, after notice to the parties interested therein." (Emphasis added.)

In this state the questions of custody and support of minor children of divorced parties, whether provided for in the final decree or otherwise, continue within the jurisdiction and control of the court, *Cambra* v. *Cambra,* 114 R.I. 553, 556, 336 A.2d 842, 844 (1975); *King* v. *King,* 114 R.I. 329, 330, 333 A.2d 135, 137 (1975); *Reynolds* v. *Reynolds,* 79 R.I. 163, 166, 85 A.2d 565, 567 (1952), notwithstanding the absence of the other spouse from this jurisdiction. *See* §15-5-16. Such matters are incidental to the divorce proceeding. *Hacking* v. *Hacking,* 78 R.I. 325, 327, 82 A.2d 168, 169 (1951). By filing her petition dated June 3, 1974, Eleanor sought to recover the delinquent support payments for her children. Clearly, she was not attacking the integrity of the final decree. Thus, it is our opinion that the Family Court retained jurisdiction over both the parties and the subject matter and properly adjudged Peter in contempt for his failure to make the overdue support payments.

## II

Having decided that the Family Court had jurisdiction over respondent, we next turn to his contention that the Family Court lacked the authority to award support payments to children who were either emancipated or had reached majority age.

The established rule is that a father's responsibility for the support of his children terminates once they reach the age of majority absent some exceptional circumstances or express

agreement between the parties to the contrary. *Bouchard* v. *Bouchard,* 119 R.I. 656, 662, 382 A.2d 810, 813 (1978); *Tuttle* v. *Tuttle,* 86 R.I. 421, 423, 135 A.2d 841, 842 (1975). However, a Family Court decree ordering child support is not self-terminating but is valid and effective until amended or terminated by an order of the court. *Bouchard* v. *Bouchard, supra; Ciallella* v. *Ciallella,* 81 R.I. 320, 325, 103 A.2d 77, 79 (1954). Since Peter unilaterally reduced the support payments by $25 per week as each child either became emancipated or attained the age of majority, his liability for the support of the three children was not terminated by proper order of the court. The Family Court justice, therefore, was correct in finding Peter in contempt for failure to make support payments for the benefit of the children.

### III

Peter also alleges that the Family Court justice erred in denying his petiton of August 23, 1976 to set aside the judgment of June 28, 1974 for failure to comply with §9-21-2. However, because he neither briefed nor argued this issue, his appeal from the decree below is deem waived. *Tente* v. *Tente,* 112 R.I. 636, 641, 314 A.2d 149, 152 (1974); *Petella* v. *Corp Brothers,* 107 R.I. 599, 614, 268 A.2d 699, 706 (1970).

### B

The two issues raised in Eleanor's appeal are as follows: (1) whether the Family Court justice erred in ordering payment of some but not all of the arrearages for unmet child support; and (2) whether the Family Court justice erred in terminating support for a child who had reached age 18 but was not yet 21 in light of the statutory lowering of the age of majority.

### I

Eleanor's first ground for appeal concerns the issue of whether the trial justice was incorrect when he ordered payment of some but not all of the arrearages for unmet child support. At the conclusion of the Family Court hearing on

Eleanor's second petition to have her husband adjudged in contempt for his failure to make support payments, and on Peter's petition to be relieved from making future payments because the children had attained the age of majority, the trial justice cited him in contempt for failure to make payments in the amount of $14,778[2] but permitted him to purge himself of contempt by paying $12,400.

It is well settled that:

> "[u]npaid allowances for alimony and support under a divorce decree are in the nature of a final judgment and cannot be retroactively disturbed, and the court's authority to modify a decree extends only to the executory portions thereof." *Tente* v. *Tente,* 112 R.I. 636, 640, 314 A.2d 149, 151 (1974); *Klimasewski* v. *Klimasewski,* 91 R.I. 308, 311, 162 A.2d 549, 551 (1960); *Ciallella* v. *Ciallella,* 81 R.I. 320, 325, 103 A.2d 77, 79 (1954).

Although the trial justice felt bound by this rule, he did not award the full extent of the arrearage. We believe that the rule is inflexible and may not be relaxed to accommodate the whims of the parties or anyone else. We hold, therefore, that the trial justice lacked the authority to retroactively modify the support sum fixed by the final decree.

## II

Eleanor's second contention is that the trial justice erred in granting Peter's petition to cease support payments for the couple's youngest child who was 19 years old at the time the order was entered.[3] Her argument is premised on the fact that §15-12-1, the statute lowering the age of majority from 21 to 18 years, became effective after the original divorce

---

[2]This amount included the $6,600 awarded under the previous decree entered on July 19, 1974, and reaffirmed in the order of October 28, 1976.

[3]The original decree was entered on November 9, 1967, and the statute became effective on March 29, 1972. The new order was entered on June 16, 1977, at which time the youngest child had reached 18.

decree providing support payments for the designated minor children was entered. She contends that the statute affects the substantive rights of the children and, therefore, it cannot be applied retroactively.

Although this issue has not been addressed in Rhode Island, it has been extensively considered in other jurisdictions. The courts which have refused to order support beyond the age of 18, after a statutory change in the age of majority, have generally based their decisions upon the premise that majority or minority is a status rather than a fixed or vested right. Annot., 75 A.L.R.3d 228, 238 (1977).

Some courts have adopted a contrary position. These courts have based their holdings upon pre-existing agreements between the parties relating to support, *Abb* v. *Crossfield*, 23 Md. App. 232, 237, 326 A.2d 234, 238 (1974), and upon decrees specifying support "until the age of 21." *Cunningham* v. *Cunningham*, 12 Wash. App. 778, 779, 532 P.2d 652, 654 (1975); *Choquette* v. *Choquette*, 232 Ga. 759, 760 208 S.E. 2d 848, 849 (1974).

Here Eleanor relies on the holding in *Vicino* v. *Vicino*, 30 Conn. Supp. 49, 298 A.2d 241 (1972). In that case, a Connecticut Superior Court justice held that support for minor children until they reach the age of 21 was a substantive right, accorded by the statute in effect at the time the decree was entered, and that it was not to be disturbed retroactively by the statute lowering the age of majority to 18. However, we believe her reliance on the *Vincino* case is misplaced and illfounded since it was expressly disapproved in *Sillman* v. *Sillman*, 168 Conn. 144, 152, 358 A.2d 150, 154 (1975), wherein the Connecticut Supreme Court ruled that minority is a status and not a vested right.

It is our opinion that minority is a status with no fixed, vested or accrued rights in future support. It is a status created by law and subject to change by legislative enactment. *Stanley* v. *Stanley*, 112 Ariz. 282, 541 P.2d 382 (1975); *Rice* v. *Rice*, 213 Kan. 800, 805, 518 P.2d 477, 481 (1974);

*Beaudry* v. *Beaudry,* 132 Vt. 53, 57, 312 A.2d 922, 925 (1973); *Schmitz* v. *Schmitz,* 70 Wis. 2d 882, 890, 236 N.W. 2d 657, 662 (1975). We conclude, therefore, that the trial justice was correct in terminating the support payments once the youngest child had attained the age of 18.

The respondent's appeal is denied and dismissed, and the decree appealed from is affirmed. The petitioner's appeal is affirmed in part and denied in part and the case is remanded to the Family Court for further proceedings consistent with this opinion.

*Ralph D. Morrison,* for petitioner.

*Macioci & Grimm, Joseph J. Macioci, E. Paul Grimm,* for respondent.