DECISION
Before this Court is a motion to compel production of one or more versions of a draft "Market Conduct" Report (Draft Report), which was prepared by examiners from the Rhode Island Department of Business Regulation (DBR) and subsequently transmitted to The Beacon Mutual Insurance Company (Beacon), a Defendant in this action.
 Facts/Travel
Beacon provides workers compensation insurance to a large portion of the employers in Rhode Island. The Plaintiffs, several of those insured employers, have brought claims against Beacon related to their pricing practices. In 2002, the Plaintiffs *Page 2 
filed suit against Beacon for such claims as breach of contract and violation of fiduciary duties.[1] The Plaintiffs now seek to be certified as class representatives for all similarly situated insured employers of Beacon.
According to a press release from the DBR, on or about September 2005, the DBR began an examination of Beacon's practices and procedures pursuant to the provisions of G.L. 1956 § 27-13.1-1 to 27-13.1-7
(Examinations Statute). (DBR Press Release of Feb. 21, 2007.) That examination was "intensified" by hiring an outside auditing firm "following receipt of an internal report prepared for the Company's Board of Directors." Id.[2]
The press release reveals that the Draft Report was transmitted to Beacon in February 2007 "for its review for any possible factual errors." Id. If any such errors existed, Beacon was to alert DBR by March 1, 2007. Id. DBR would then provide Beacon with a final version of the Report "after which the Board of Beacon will have 30 days to respond to DBR's findings." Id. "DBR will then review Beacon's response, and the Director [of the DBR] will formally accept or reject the Report." That press release also indicated that the report must remain confidential until 30 days after the Director of the DBR adopts the Report.Id.
DBR enclosed a cover letter with the Draft Report transmitted to Beacon. Signed by its Director, the letter states that
 "[DBR] has a longstanding practice to allow an examined company to review the draft and advise [DBR] of any *Page 3 
inadvertent errors or oversights within the report. In addition, [DBR] hereby requests that [Beacon] keep this draft confidential, and continue to maintain such confidentiality throughout the upcoming process of concluding the exam. This process will require that you: (1) prepare substantive responses to the final report; (2) enable the Department to evaluate your responses; and (3) await the [DBR] Director's acceptance and approval of the report before releasing.
 . . . Finally, kindly submit your proposed revisions to the draft no later than March 1, 2007." (Letter of Marques to Rosati, Feb. 19, 2007.)
The Plaintiffs originally filed this motion on February 23, 2007, during the ten day period within which Beacon was to review the Draft Report, in order to require Beacon to produce it to the Plaintiffs. The Plaintiffs also seek Beacon's response document and the finalized versions of the examination reports as soon as they are transmitted to Beacon.
This Court heard argument and permitted the parties to file supplemental briefs on the issue. DBR submitted an amicus brief, urging the Court to deny the motion. Several other amici also filed briefs urging the Court to require Beacon to disclose the Report to the Plaintiffs.[3] The Court again heard argument on April 9, 2007, before taking the matter under advisement.
During this most recent hearing, DBR and Beacon stated that the Draft Report has been returned to DBR, and that Beacon no longer had the report in its possession. DBR also stated that it was still proofreading the Report, and that when complete, the Report will be verified by the examiner(s) and transmitted to Beacon pursuant to Section 27-13.1-5(b). *Page 4 
 Analysis
As a threshold issue, the Court must first determine whether the Report falls within the general scope of discoverable matters. The scope of discovery includes "any matter, not privileged, which is relevant to the subject matter involved in the pending action." Super. R. Civ. P. Rule 26(b)(1) (emphasis added). Relevance includes information relating "to the claim or defense of the party seeking discovery or to the claim or defense of any other party. . . ." Id. The materials sought need not be admissible at trial so long as they are reasonably calculated to lead to admissible evidence. See id.
The Court has entered a case management order which provides that, subject to certain inapplicable exceptions, "all discovery other than that associated with class certification shall be stayed pending decision on Plaintiffs' Motion for Class Certification." (Third Am. Scheduling Order for Class Discovery and Briefing, Feb. 21, 2007.) Therefore, the Court will not grant the motion unless the Report is reasonably calculated to lead to information admissible on the issue of class certification, and not privileged from disclosure.[4] *Page 5 
 I Scope of Discovery
Although the Defendants concede that the Report would be relevant to the merits of the Plaintiff's claims, they argue that the report has no relevance to class certification. The Plaintiffs respond, however, that the Report is relevant to the elements of commonality and typicality that they must demonstrate in order to certify a class. See Super. R. Civ. P. Rule 23(a)(2) (requiring that there be "questions of law or fact common to the class"); Rule 23(a)(3) (requiring that "the claims or defenses of the representative parties are typical of the claims or defenses of the class"). They further argue that their complaint is largely based upon the findings of the Giuliani Report, and that the Market Conduct Report is based upon the same underlying facts.
The scope of discovery is broad, and the information sought need not be admissible itself, so long as it is reasonably calculated to lead to admissible evidence. It is impossible to know for certain, without seeing the content of the Report, whether its contents actually are pertinent to class certification. However, before addressing this issue further, the Court will assume arguendo that the Draft Report is at least reasonably calculated to contain information relevant to class certification.
 II Claim of Privilege
The main question upon which the dispute revolves is whether the Draft Report is privileged from disclosure. See Fireman's Fund Ins. Co. v.McAlpine, 120 R.I. 744, 747 (R.I. 1978) (noting that in this context, "the term `privileged' denotes the recognized exclusions found in the law of evidence, such as those related to the attorney-client or the husband-wife relationship"). Specifically, the parties disagree as to whether the *Page 6 
provisions of the Examinations Statute, which governs DBR examinations of insurers, contains a privilege that would insulate Beacon from having to disclose the Draft Report.
 A. Structure of the Examinations Statute
The Court will first examine the relevant provisions of the Examination Statute. The purpose of the statute is "to provide an effective and efficient system for examining the activities, operations, financial conditions, and affairs of all persons transacting the business of insurance in this state. . . ." Section 27-13.1-1.
The manner in which examinations are conducted is governed by section 4 of the statute. The Director of DBR begins by appointing one or more examiners[5] to conduct the examination. Section 27-13.1-4(a). The examined company is expected to provide those examiners with "timely, convenient and free access" to its books and records. Section27-13.1-4(b). In conducting the examination, "the examiner shall observe those guidelines and procedures set forth in the Examiners' Handbook in effect at the time of the examination adopted by the National Association of Insurance Commissioners. The director may also employ any other guidelines or procedures as the director may deem appropriate." Section 27-13.1-4(a). Section 4 also gives the Director authority to issue subpoenas, and to hire professionals, in furtherance of his examination duties. Section 27-13.1-4(c)-(d).
The examiners then prepare a report of their findings pursuant to section 5. Upon completing the examination, the examiner "shall file with the department a verified written report of examination under oath." Section 27-13.1-5(b). The report is to consist *Page 7 
only of "facts appearing upon the books, records, or other documents of the company. . . and the conclusions and recommendations as the examiners find reasonably warranted from the facts." Section27-13.1-5(a). When DBR receives the verified report, it is required to "transmit the report to the company examined, together with a notice that shall require that the company examined file with the commissioner a written response to all comments and recommendations contained in the examination report." Section 27-13.1-5(b). That response must be either a plan of action designed to correct any deficiencies found during the examination, or a rebuttal explaining why such action is not necessary.See id.
Although the statute does not state a deadline for the company to formulate its responses, counsel for DBR stated that its practice was to allow a thirty day response period following the transmittal of the verified report. Once DBR receives the company's response, the Director must take action within another thirty days by either 1) adopting the report as filed or with modifications, and ordering any necessary corrective actions; 2) rejecting the report and ordering the examination to be reopened; or 3) calling for an investigatory hearing.See § 27-13.1-5(c)(3).
 B. Mootness and Ripeness
The Court notes that, according to DBR and Beacon, the Report is no longer in Beacon's possession. Therefore, Beacon argues that the motion has become moot because it would be unable to comply with any order of production.[6] While the parties *Page 8 
dispute whether the Examinations Statute prohibits Beacon from disclosing a draft or preliminary report, as will be described below, the statute clearly prohibits DBR from releasing such a report except in narrow circumstances not applicable here. Therefore, Beacon's argument that it no longer has the ability to comply has some persuasive force.
DBR's letter, which accompanied the Draft Report, emphasized the need for Beacon to keep the Report confidential until the examination process concluded. (Letter of Marques to Rosati, Feb. 19, 2007.) However, nowhere does it state any requirement that Beacon return its copies of the Report to DBR. See id. (stating only that DBR "will defer to [Beacon's] judgment as to the controls you utilize to safeguard the confidentiality" of the Report). One would expect such a requirement, if it existed on February 19, 2007, to be expressed in that cover letter.
Beacon and DBR have suggested that a verbal agreement provided for the return of the Draft Report. However, they have not submitted any affidavits in support of that assertion. Moreover, this information was not brought to the Court's attention until after the end of the "errors or oversights" period even though Beacon and DBR both submitted briefs before that period expired. See Beacon Obj. to Pl's Mot. To Compel 4, Feb. 26, 2007 (stating that "the [Draft Report] will not be lost in the time required by the Rules for discovery issues to be appropriately addressed").
In fact, the cover letter seems to contemplate that Beacon will use the Report not only to point out any "errors or oversights," but also to begin preparation of the substantive responses to the Report. Seeid. (noting that Beacon should keep the Draft Report confidential during the remainder of the examination process, which "will require *Page 9 
that you. . . prepare substantive responses to the final report"). The phrase "substantive responses" refers to the procedure outlined in § 27-13.1-5(b), which still has yet to occur, and which is likely to take longer than the ten day "errors or oversights" period. Such advance preparation would be difficult if Beacon did not retain the Draft Report.
Under these circumstances, it is reasonable to conclude that no return of the Draft Report was contemplated on Feburary 19, 2007. If so, under the circumstances surrounding the transmittal of the Draft Report, it would follow that Beacon returned the report to DBR only to avoid disclosure to the Plaintiffs. If the Court determines that the Plaintiffs were entitled to the Report from Beacon during the ten day "errors or oversights" period when they made their motion, the Court has no doubt that it could craft a remedy to account for the fact that Beacon no longer has the Report. To hold otherwise would simply encourage gamesmanship among the parties before this Court, and the Court is loath to do so. Therefore, the Court will treat this motion as if Beacon was still in possession of the Draft Report.
 C. Privileges Under the Examinations Statute
The drafters of the Examinations Statute recognized that, in order to encourage cooperation by examined companies,[7] some protection was needed for confidential information that examiners were likely to encounter. Therefore, it provides specific procedures for releasing the examination report, as distinguished from the documents and working papers underlying that report. Upon adoption of the report,
 "the director shall continue to hold the content of the examination report as private and confidential information *Page 10 
for a period of thirty (30) days following the mailing of the notice of order, except to the extent provided in subsection (b). After this, the commissioner may open the report for public inspection so long as no court of competent jurisdiction has stayed its publication." Section 27-13.1-5(e).
This provision reflects the probability that an examination may uncover information which may be sensitive to the examined company. However, it also reflects the public interest in having access to the findings of examination reports. Therefore, DBR is prohibited from releasing the finalized report for thirty days so that the examined company may seek relief from a court to stay the publication. After that period, however, the Director "may open the report for public inspection."Id.[8]
The Examinations Statute also contemplates that DBR will receive and generate documents, other than the examination reports, which contain information sensitive to the examined company. Therefore, it provides that
 "[a]ll working papers, recorded information, documents, and copies of them produced by, obtained by, or disclosed to the director or any other person in the course of an examination made under this chapter must be given confidential treatment and are not subject to subpoena and may not be made public by the director or any other person. . . ." Section 27-13.1-5(f).
This provision may be waived by the examined company. Id.[9] Beacon suggests that this section creates a privilege from having to disclose any documents which fall within the scope of the section, and that the Draft Report is such a document. *Page 11 
In order to properly perform its task, DBR will obtain documents and create working papers during its examination, and in the process of preparing the examination report, which contain sensitive information. However, the examined company has no control over whether a governmental entity will release those documents, so a statutory protection is required. Therefore, under sections 5(e) and 5(f), not only is DBR prohibited from releasing ancillary documents, but it is also immune from subpoena, the Access to Public Records Act, or any other means for making such documents public when in the control of DBR. Moreover, DBR is not allowed to release the examination report until the examined company has a chance to seek court intervention to protect any sensitive information.
However, the Court finds that the purpose of these two provisions is applicable only to documents in the possession of DBR and its agents.See Moretti v. Lowe, 592 A.2d 855, 857 (R.I. 1991) (finding that privileges from discovery are "to be strictly construed and limited to its intended purpose," and that the burden rests on the party resisting discovery to prove entitlement to the privilege) (citations omitted). Although section 5(f) does refer to "the director or any other person," this merely recognizes the fact that the Director may contract with other persons to assist in the examinations process. It does not create a new privilege for any document which the Director might have produced or obtained if the examined company has possession of that document.[10] Such a broad construction of this provision would allow Beacon to assert a privilege with respect to every document reviewed or disclosed to DBR, even if they otherwise would not be privileged. *Page 12 
DBR has argued that by seeking the Draft Report from Beacon, as opposed to DBR, the Plaintiffs are attempting to avoid the statutory prohibitions against disclosure. The Court finds, however, that the Examinations Statute merely provides a procedural mechanism so that persons beyond the examined company's control will not cause it harm by disclosing sensitive information which may otherwise be privileged.[11] Because the Plaintiffs are seeking disclosure from Beacon itself, and not DBR or other public agencies, Beacon is capable of protecting any sensitive information from disclosure to the Plaintiffs. To the extent that the information contained in the Report is subject to a privilege running in favor of Beacon — for example, to protect trade secrets or the personal information of its insureds — Beacon may assert that privilege on its own behalf. In doing so, it has at its disposal all the tools of a civil litigant, such as redaction, protective orders, and in camera reviews.
The statute is designed to assure companies such as Beacon that they will not suffer harm from disclosure by entities over which they have no control, so that they will be encouraged to cooperate with DBR during an examination. This rationale simply has no application to the case where the Plaintiff seeks disclosure directly from the examined company. Therefore, the Court finds that if there is a privilege in favor of Beacon, that privilege is not found in the Examinations Statute.[12] *Page 13 
 D. The Interests of DBR
Although the Court finds that the Examination Statute does not privilege Beacon from disclosing the Draft Report, this is not the end of the inquiry. The Court must also examine whether DBR has any interests in the matter which should move this Court to prevent disclosure to the Plaintiffs.
It is undisputed that the Draft Report which was transmitted to Beacon is not the verified report contemplated by the statute. Rather, DBR has followed its "longstanding practice" to allow Beacon to review a draft for any "inadvertent errors or oversights." (Letter of Marques to Rosati, Feb. 19, 2007.) In doing so, DBR clearly contemplated that Beacon would keep this Draft Report confidential until the examination process concluded. Id. The verified report has not yet been completed or transmitted to Beacon.[13]
Although the Court does not find a privilege in favor of DBR in the Examinations Statute, many jurisdictions have recognized a "deliberative process" privilege which has been utilized to protect a public agency from disclosing certain materials.[14] One purpose of this privilege is to enhance the quality of agency decision making by encouraging persons within an agency to make comments and recommendations without concern that those deliberations will become public. See,e.g., Grand Cent. P'ship., Inc. v. Cuomo, *Page 14 166 F.3d 473, 481 (2d Cir. 1999) (noting that the privilege "serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism"). The privilege also "protect[s] against premature disclosure of proposed policies before they have been finally formulated or adopted" and prevents "confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." Id. Our Supreme Court has recognized the existence of this privilege, although Rhode Island law is sparse on the subject.See In re Commission on Judicial Tenure Discipline, 670 A.2d 1232,1235 (R.I. 1996) (referring to the deliberative process privilege as one which "protects the internal deliberations of an agency in order to safeguard the quality of agency decisions").
Courts applying this privilege have looked to whether a document was "pre-decisional" and whether it was "deliberative" in order to ascertain whether a particular document should fall within this privilege. A document is pre-decisional if it is "prepared in order to assist an agency decisionmaker in arriving at his decision." Nadler v. U.S. Dep'tof Justice, 955 F.2d 1479, 1491 (11th Cir. 1992) (internal quotations omitted). In this case, the Examinations Statute specifically provides that the examination report will serve as the basis, in conjunction with the company's response, for the Director's decision to either (1) adopt the report and order remedial measures, (2) reject the report and order further examination, or (3) convene a hearing. See § 27-13.1-5(c)(1) to (3). *Page 15 
It is not enough that a document merely precedes a decision, however. It must be deliberative such that it "makes recommendations or expresses opinions on legal or policy matters." Vaughn v. Rosen, 173 U.S. App. D.C. 187 (D.C. Cir. 1975). Stated differently, it must be "part of the agency give-and-take — of the deliberative process — by which the decision itself is made." Id. In contrast, purely factual materials are not considered deliberative and, therefore, are not privileged.Id. In this case, however, the contents of the examination report, in addition to containing facts found in the books of Beacon, will contain "conclusions and recommendations as the examiners find reasonably warranted from the facts." Section 27-13.1-5(a). These are recommendations which the Director of DBR might ultimately reject, and he may decide not to make the report public. See § 27-13.1-5(c)(2), (e)(1).
As noted above, privileges must be strictly construed in light of their intended purposes. See Pastore v. Samson, 900 A.2d 1067, 1076
(R.I. 2006) (citing Moretti, 592 A.2d at 857). However, in this case the purposes of the deliberative process privilege are directly applicable to this case, and justify denying the Plaintiffs' motion. The Court finds that ordering Beacon to disclose the Draft Report, before the Director has had an opportunity to act on a verified report, would unduly interfere with the examinations process.
The first rationale for the privilege requires this Court to predict the effect on examiners, if those examiners believe that their reports will be disclosed in the future under similar circumstances. It is true that the examiners must have contemplated that the substance of their report would eventually become public knowledge, even if certain *Page 16 
"errors or omissions" were found and corrected.[15] Therefore, disclosure at this point may not have as great a chilling effect on their recommendations and conclusions, because the examiner knows the substantial likelihood that his or her work product will eventually become public. However, if the examiner believes that his or her report will be made public before the company's rebuttals are considered, and before the Director has a chance to weigh the potentially competing viewpoints, that knowledge likely will color the examiner's recommendations and conclusions. Such an examiner might be tempted to "pull his punches" if he reasonably believes that his report will be disclosed immediately, before the process concludes.
More importantly, though, disclosure would risk the premature dissemination of recommendations which might not ultimately be adopted by the Director of DBR, and rationales which might not ultimately be accepted. The Plaintiffs have suggested that, because they are under a protective order, there is no risk of public dissemination of the Report's contents. The Defendants and DBR respond that the Plaintiffs are the public — Beacon's insureds — so that disclosure to them by definition defeats the deliberative process privilege.
The Court finds their argument to be compelling on this point. The Court has no reason to believe that these Plaintiffs and their attorneys will not comply with the protective order. However, future examiners may not share that confidence. Even the effect that the Draft Report has on this litigation, and these Plaintiffs, could affect the *Page 17 
examiner's recommendations, and the Director's options, for any remedy flowing from the report. Moreover, while it is true that these Plaintiffs have been ordered to protect the contents of the Report, this may not be true in all cases. At the time the examiner is making his report, that examiner does not know the intricacies of every lawsuit in which the examined company is or might become involved. Even a limited disclosure under a protective order, therefore, is likely to affect the content of future examination reports.
The Court notes that DBR is not a party to this action, and it should not have to involve itself in every lawsuit in which an examined company is a party in order to protect its deliberative process. Therefore, a strict rule of non-disclosure would be justified so that DBR's deliberative process will be protected, and the quality of its decision-making process enhanced, without the need for it to insert itself into every lawsuit involving examined companies. For this reason, even if it were possible, the Court will not try to segregate the deliberative portions of the Draft Report from the factual portions of the Report, because doing so would necessarily require DBR's participation.
Finally, the Plaintiff and several of the amici have questioned whether it was proper for DBR to disclose the Draft Report to Beacon for a "quick look" prior to the transmittal and response provided by §27-13.1-5(b). They argue that such a procedure casts doubts upon the legitimacy and transparency of the examinations process, because the statute provides an explicit procedure for eliciting Beacon's input which does not call *Page 18 
for this "quick look."[16] Clearly, the Examinations Statute does not specifically provide for this procedure. It does not specifically prohibit such a procedure, either.
The motion before this Court, however, is whether or not to order Beacon to disclose the Draft Report. Even if DBR's actions were improper, the Plaintiffs have not shown why that should affect the outcome of its motion. DBR felt it necessary to disclose the Draft Report to Beacon, but it did so with the understanding that it would be kept confidential for a period of time. Moreover, the statute specifically calls for the verified report to eventually be disclosed to Beacon as part of the examinations process. Therefore, the Court does not find that the transmittal of a draft somehow defeats DBR's deliberative process privilege. See Cooper v. Department of Navy,558 F.2d 274, 278 (Former 5th Cir. 1977) ("limited disclosures to proper outside persons as are necessary to carry out effectively a purpose for assembling a governmental report in the first place do not waive its privilege.")
In Cooper, investigators of an aircraft catastrophe made assurances to witnesses that their statements would be kept confidential.Id. at 277-78. The Court found that a report containing such information was privileged, and that the privilege was not waived by disclosures of the report to a manufacturer's technical representatives, because the purpose of the report was to prevent further accidents in the future.Id. Here, the Court finds that disclosures by DBR to Beacon during the examination process were based upon assurances of confidentiality, and therefore do not defeat DBR's privilege, even if transparency concerns might otherwise render DBR's disclosures improper. *Page 19 
If a party feels that it has been aggrieved by DBR's process, it should pursue a proper remedy against the DBR. See § 27-13.1-5(d)(1) (providing the Director of DBR shall enter an order, and that such orders under the Examinations Statute are reviewable under the Administrative Procedures Act); G.L. 1956 § 42-35-15(g)(3) (providing for judicial review of agency actions made "upon unlawful procedure"). However, DBR is not even a party to this action, so the Court will presume for purposes of this action that DBR's action was proper.
 Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court will deny the Plaintiffs' motion for an order compelling Beacon to produce the Draft Report.
Counsel for Beacon may present an order consistent herewith which shall be resolved after due notice to counsel of record.
[1] This case has resulted in two written rulings from this Court.Heritage Healthcare Servs. v. Beacon Mut. Ins. Co., 2005 R.I. Super. LEXIS 140 (Aug. 29, 2005); Heritage Healthcare Servs. v. Beacon Mut.Ins. Co., 2004 R.I. Super. LEXIS 29 (Jan. 21, 2004).
[2] The press release appears to be referring to the "Almond Report," which included as an attachment the "Giuliani Report," the findings of which have formed the basis for many of the allegations in the Plaintiffs' Eighth Amended Complaint.
[3] The Court thanks DBR, the Center for Insurance Research, United Policyholders, Consumer Federation of America, the California Reinvestment Coalition, Empire Justice Center, and New Jersey Citizen Action for their assistance in this matter.
[4] Beacon chastises the Plaintiffs for immediately moving for an order compelling discovery. Normally a party must serve a discovery request before brining a Rule 37 motion to compel. However, because the case management order provided that discovery relative to class certification was closed as of November 30, 2006, the Plaintiffs would have violated this Court's order by propounding a request for production under Rule 34. Therefore, it was proper to seek Court intervention before serving any discovery related to the Report, although the Plaintiffs should probably have described their request as seeking relief from that order.
It also has not escaped this Court's attention that the Plaintiffs have not complied with the requirement of Super. R. Civ. P. Rule 37(a)(2) which requires that a motion to compel discovery must include a certification that the movant "has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action." It appears that any efforts to obtain the report without court action would have been fruitless, however, given the positions taken in this motion. Therefore, the Court will address the motion in spite of the missing certification. However, this should not be considered an invitation to disregard the mandates of the Rules of Civil Procedure in the future.
[5] "Examiner" is defined by the statute as "any individual or firm having been authorized by the director to conduct an examination under this chapter." Section 27-13.1-1(4). According to representations by DBR, the examiner in this case is an employee or employees of DBR who conducted the examination with the assistance of an outside firm.
[6] Beacon also suggests that any attempt to compel production from DBR, even if the Plaintiffs would be entitled to disclosure, is not ripe at this point because the Plaintiffs have not complied with the procedures under the Access to Public Records Act. See G.L. 1956 §38-2-1 to 38-2-15. Although DBR's perspectives and interests are relevant considerations in this motion, DBR is not a party nor is it presently under a subpoena. Therefore, the Court will focus only upon whether Beacon may be compelled to disclose the Report.
[7] The statute also provides a means to coerce cooperation from unwilling companies by suspending any license under DBR's jurisdiction which is needed by the company to transact business. Section27-13.1-4(b).
[8] Although the word "may" indicates that the Director has discretion whether to open the report or not, DBR states that its practice has always been to make the reports public, and that it intends to do so in this case as well. The Court takes no position in this decision as to whether he is required to open the report to the public under this provision.
[9] This subsection is entitled "Confidentiality of ancillary information." Although the Court does not find section captions to be authoritative, in this case the caption does accurately convey the meaning of the provision.
[10] The fact that the examined company may waive the protections of this subsection negates any possible argument that the provision was intended to protect the interests of DBR. Rather, DBR is expected to assert the privilege, pursuant to the statute, on behalf of the companies it examines.
[11] The statute does provide a means for the Director, "in his or her sole discretion," to share information with other agencies "in the furtherance of any legal or regulatory action." Section 27-13.1-4(f). The Director may also share such information with regulators and law enforcement officials in Rhode Island and other jurisdictions, so long as they agree to hold the information as confidential. Section27-13.1-5(e)(2).
[12] Plaintiffs have suggested that the Examinations Statute clearly distinguishes between examination reports, and working papers. Therefore, the Draft Report would not be a working paper and would not be privileged from disclosure. However, because the Court finds that sections 5(e) and 5(f) only apply to documents in the possession of DBR, and because the Court is treating this motion as if Beacon still possesses the Draft Report, it need not address whether the Draft Report is a "working paper" within the meaning of section 5(f).
[13] This Court found it somewhat surprising that the verified report has not yet been completed. Beacon was supposed to have pointed out any errors or omissions by March 1, 2007. Although the examination report is apparently close to 300 pages long, it has been over a month since that date. One could infer, therefore, that either the changes between the draft and final versions involve more than simple grammatical or computational errors, or that this motion has caused DBR to delay transmitting the verified report.
[14] Rhode Island's Access to Public Records Act contains a codification of this privilege which applies to requests for public documents under its provisions. See G.L. 1956 § 38-2-2(4)(i)(K) (exempting from the definition of public records any "[p]reliminary drafts, notes, impressions, memoranda, working papers, and work products; provided, however, any documents submitted at a public meeting of a public body shall be deemed public").
[15] As noted above, the Examinations Statute provides that the Director "may" make the examination report public. Section27-13.1-5(e)(1). Even if the Director withheld the report, when the Director executes his order disposing of the report, his action must include "findings and conclusions resulting from the director's consideration and review of the examination report, relevant examiner workpapers, and any written responses or rebuttals." Section27-13.1-5(d)(1). Therefore, the contents of the report will almost certainly become public in some form.
[16] Beacon itself has suggested that its "errors or omissions" response contained "not only factual inaccuracies but also [drew] attention to the need to protect from disclosure certain proprietary and personal confidential information." (Beacon Supplemental Mem. Opp. Pl's Mot. to Compel, Mar. 20, 2007.) *Page 1