**STATE**

v.

**Claus von BULOW.**

**No. 82–462–C.A.**

Supreme Court of Rhode Island.

April 27, 1984.

Order May 24, 1984.

See also, R.I., 447 A.2d 380.

Dennis J. Roberts II, Atty. Gen., Stephen
R. Famiglietti, Asst. Atty. Gen., Sharon
O'Keefe, Sp. Asst. Atty. Gen., Susan E.
McGuirl, Deputy Atty. Gen., for plaintiff.

Alan M. Dershowitz, Cambridge, Mass., John A. MacFadyen, III, Vetter & White, Providence, for defendant; Susan Estrich, Jeanne Baker, Cambridge, Mass., David Fine, Joann Crispi, New City, N.Y., of counsel; Mark D. Fabiani, Pacific Palisades, Cal., Stephanie Cleverdon, Cambridge, Mass., on brief.

OPINION

MURRAY, Justice.

This is an appeal by the defendant, Claus von Bulow, from a Superior Court conviction on two counts of attempting to murder his wife, Martha von Bulow. The indictment was handed down by a Newport County grand jury on July 6, 1981, charging the defendant with two separate counts of assault with intent to murder his wife. The trial commenced in Newport on February 2, 1982, before a justice of the Superior Court and a jury. On March 16, 1982, after six days of deliberation, the jury found the defendant guilty on both counts.

The defendant moved for a judgment of acquittal and a new trial. These motions were denied by the trial justice on March 17 and April 2, 1982, respectively. On May 7, 1982, defendant was sentenced to ten years at the Adult Correctional Institution on the first count and twenty years at the Adult Correctional Institution on the second count, these sentences to be served consecutively. The defendant now appeals from the judgment of conviction entered below.

After a trial spanning six weeks, the record of which includes more than 5200 pages of transcript embodied in twenty-six volumes, Claus von Bulow was found guilty of twice attempting to murder his wife by injecting her with doses of insulin. There were no eyewitnesses to these alleged crimes. Rather, the jury found defendant guilty on the basis of circumstantial evidence.

On December 21, 1980, Martha von Bulow was found in a comatose state on her bathroom floor in the family's Newport home—Clarendon Court. She remains in that condition at a New York hospital. Approximately one year earlier, she suffered a similar episode of unconsciousness from which she quickly recovered. The occurrence of the second coma triggered the events leading up to defendant's indictment, trial, and conviction. Suspecting that defendant may have poisoned his wife, Martha von Bulow's son, Alex; her daughter Ala; and her mother, Mrs. Aitken, hired former Manhattan District Attorney Richard Kuh to investigate the cause of Mrs. von Bulow's condition.

Chronologically, the events that gave rise to the family's suspicion and culminated in its investigation of defendant's possible criminal involvement are essentially as follows.

On December 27, 1979, Martha von Bulow suffered her first coma. On the previous evening, she became weak and uncoordinated and had to be helped to her bedroom by her son Alex. Maria Schrallhammer, Martha von Bulow's personal maid, testified that shortly after nine thirty on the morning of December 27, 1979, she heard Mrs. von Bulow moaning in her bedroom. Upon entering the room, she unsuccessfully attempted to arouse Mrs. von Bulow. Alarmed, she asked defendant to call a doctor, which he refused to do at that time. The defendant did call a doctor, however, at approximately two o'clock that afternoon. The doctor was not in, and defendant left a message. The doctor returned the call about an hour later and defendant relayed to him several of his wife's symptoms.

In this regard, Maria testified that the description of Mrs. von Bulow's condition given by defendant to the doctor was untrue. Specifically, Maria testified that defendant's statements that Mrs. von Bulow had an alcoholic problem and that she had been drinking the night before and had been out of bed that morning were untrue.

At approximately six o'clock that evening, Martha von Bulow's condition worsened. The defendant called the doctor and

conveyed to him the severity of her condition. Upon the doctor's arrival, Mrs. von Bulow vomited, began gasping for breath, stopped breathing, and experienced cardiac arrest. The doctor successfully resuscitated her and later testified that she had become comatose a few minutes prior to his arrival. Mrs. von Bulow was transported to Newport Hospital. Blood tests indicated that her blood-sugar level was unusually low. Mrs. von Bulow regained consciousness, recovered, and was discharged on January 2, 1980, with a diagnosis of "broncho-pneumonia * * * cardio-respiratory arrest due to massive aspiration of gastric contents * * * hypoglycemia of undetermined etiology."

Maria Schrallhammer further testified that in February 1980 she found something in the von Bulows' New York apartment which disturbed her. While cleaning a walk-in closet off defendant's bedroom, she noticed a large black traveling bag belonging to defendant. Upon looking inside this bag, she discovered a smaller black bag or pouch (hereinafter referred to as the black bag). Maria removed the black bag, opened it, and examined its contents. Inside the black bag she found three vials— one containing pills, one containing powder, and one containing liquid. She then replaced the black bag and its contents inside the larger traveling bag. Some days or weeks later, Maria returned to the traveling bag, removed the black bag, and again examined its contents. On this occasion she wrote down the information contained on the labels of each vial on three separate pieces of paper.

In November 1980, around Thanksgiving, Maria once again noticed the black bag— this time she found it inside a white canvas bag located on a chair in defendant's bedroom. She again examined the contents of the bag. In addition to the three vials that she had seen previously, she stated that it now contained two or three needles, a syringe, and a small bottle labeled "insulin." Shortly thereafter, she called Alex into the room and showed him the contents of the black bag.

On December 19, 1980, Mr. and Mrs. von Bulow, along with defendant's daughter, Cosima, left New York and traveled to their Newport home where they were met by Alex. Maria testified that on that date she again saw the black bag inside the white canvas bag. She again examined the contents of the bag and found it to be substantially the same as it was in November. Once again she replaced the bag where she had found it and carried the white canvas bag to the elevator to be brought down to the family car for the trip to Rhode Island.

On the evening of December 20, 1980, defendant, Mrs. von Bulow, Alex, and Cosima were driven by the family chauffeur to a local cinema. The family was driven back to Clarendon Court after the movie. Upon their return, Alex accompanied his mother to her bedroom, where they spoke briefly. Martha von Bulow subsequently went into the bathroom, and Alex adjourned to the library. A short time later Mrs. von Bulow joined her son in the library where they continued their conversation.

At some point during the conversation, defendant entered the library and asked his wife if there was anything that she needed. She asked him to bring her some soup, which he did.

Alex testified that after about an hour of conversation he noticed that his mother was experiencing symptoms of weakness and lack of coordination similar to those he had observed the previous December. When she experienced difficulty standing, Alex carried her to her bedroom. Alex then went to his stepfather's study and informed defendant that Mrs. von Bulow was feeling weak. Immediately thereafter, Alex returned to his mother's bedroom. Approximately five minutes later, Mrs. von Bulow emerged from her bathroom and walked to her bed. Alex helped his mother into bed as she was apparently still feeling very weak. A few minutes later, according

to Alex's testimony, defendant came into the bedroom. Shortly thereafter, Alex left his mother and defendant alone in the bedroom.

Alex testified further that on the following morning, December 21, 1980, he awoke at approximately eleven o'clock. While dressing and before going downstairs to breakfast, he looked out his window and observed defendant walking back to the house from the ocean. Alex then went downstairs to the dining room. At some point defendant came into the hallway, and Alex asked him whether his mother had gotten out of bed yet. The defendant appeared surprised to hear that his wife might still be in bed and walked toward her room. Alex testified that some ten or fifteen minutes later, defendant returned to the hallway near the dining room and motioned for him to come. Alex followed defendant to his mother's bedroom. Upon entering the room, he walked into the bathroom and discovered his mother lying unconscious on the floor. Alex testified that defendant placed his finger under his wife's nose and determined that she was still breathing. The defendant then left the room, apparently to call a doctor or the rescue squad. A few minutes later, paramedics responded, and Martha von Bulow was taken to Newport Hospital.

On December 22, 1980, Martha von Bulow was moved to Peter Bent Brigham Hospital in Boston. She was later transferred to Columbia Presbyterian Hospital in New York. During the period of time in which she was at the Boston Hospital (approximately three weeks), defendant and Alex alternately traveled to Boston for several days at a time to stay with Mrs. von Bulow. Alex testified that shortly after his mother had been transferred to Boston, he went into defendant's closet at Clarendon Court to look for the black bag. He did not find the bag on that occasion. Several days later, on December 27 or 28, 1980, he again attempted to enter defendant's closet for the purpose of locating the black bag. On this occasion, however, the closet was locked and he made no further effort to gain entry.

Alex later discussed his suspicions regarding defendant with Maria; his sister, Ala; and his grandmother, Mrs. Aitken. Alex, Ala, and Mrs. Aitken subsequently discussed the possibility of hiring an attorney to look into the causes behind Martha von Bulow's condition. The family's financial advisor, Morris Gurley, was asked to recommend such an attorney. Gurley suggested the name of former Manhattan District Attorney Richard Kuh.

Sometime in early January 1981, Alex and Ala met with Kuh for the first time. The meeting lasted approximately one to one and a half hours. Alex testified that he and Ala discussed with Kuh their suspicions regarding defendant's conduct during those periods surrounding their mother's two comas. Alex testified further that between the time of this first meeting and January 23, 1981, there were at least six more meetings with Kuh.

Several days prior to January 23, 1981, Alex told Kuh about his previous attempts to locate the black bag in defendant's closet at Clarendon Court. It was apparently then decided that Alex would go back to Newport to look, once again, for the black bag.

On the afternoon of January 23, 1981, Alex drove from New York City to Rhode Island with a Mr. Edwin Lambert, a private investigator hired through Kuh. Alex and Lambert first went to Providence to engage a locksmith and then traveled on to Newport.

Once at Clarendon Court, Alex, Lambert, and the locksmith went to defendant's study. Alex obtained a set of keys from defendant's desk. The locksmith examined the keys and identified which key would fit the lock to defendant's closet. The door was opened, and the locksmith was dismissed.

Prior to searching the closet, Alex and Lambert searched the bathroom in defendant's study and the study itself. Nothing

unusual was found in the bathroom. In the study—in defendant's desk—Alex found a vial with French wording upon which he believed the word "Valium" was printed.

Once the search of the study was completed, Alex and Lambert entered defendant's closet. Alex initially went through some of defendant's clothes—patting the pockets—and discovered another vial similar to the one he had discovered in the desk. Alex testified that one of these two vials contained a powdered substance; however, he could not later be sure which one it was.

At some point during the search of defendant's closet, Lambert discovered a metal box. This metal box contained a small black bag that Alex recognized as being similar to the one he had seen before. Alex testified that the bag contained a prescription vial with different types of pills in it and another vial in which there was a light blue liquid. The black bag also contained two packets of ampules in plastic packaging, a syringe, and three hypodermic needles, one of which was unsealed. Inside the metal box, next to the black bag, Alex and Lambert also found a small cardboard box labeled "lidocaine" and containing an ampule and a syringe.

Upon completing the search of defendant's study and closet, Alex looked through his mother's room. He took pills from various containers found in the room and a vial of Inderal from the night table. When the entire search was completed, Alex placed all the items found (with the possible exception of the lidocaine) into the black bag and transported it all back to New York. Alex testified that the lidocaine may not have fit into the black bag but was included with the items that he transported to New York.

Upon his return to New York, Alex initially went to his sister's apartment. He was then accompanied by Kuh to the office of Kuh's brother, a doctor, where the contents of the black bag were removed and examined. After the items had been examined, Alex returned them to his sister's apartment and placed them in a safe in her closet.

At some point during the next few days Alex removed the bag from the safe and prepared samples of some of the items to give them to the family physician, Dr. Richard Stock. Alex testified that the unsealed hypodermic needle, a sample of the blue liquid, and a sample of speckled white powder from one of the French vials of Valium were sent to Dr. Stock for testing. Doctor Stock sent these items to the Bio-Science Laboratory in Great Neck, Long Island.

Doctor Ronald L. Gambardella, director of the Bio-Science Laboratory in Great Neck, testified that he rinsed the needle with a saline solution and split the resultant washing into two separate specimens. He sent one of these specimens to Dr. J. George Nitis, director of the Bio-Science Laboratory branch in Columbia, Maryland, for a test to determine the presence of insulin. The other specimen was sent to Dr. V.J. Aggarwall, assistant director of the Boston Medical Laboratory, another branch of Bio-Science, for chemical testing to determine the presence and identity of other drugs. Doctor Gambardella also sent the white powder and the liquid to Dr. Aggarwall.

Doctor Nitis testified that the tests performed at his laboratory revealed the presence of insulin in the needle washing. Doctor Aggarwall testified that the washing he received contained amobarbital and diazepam (Valium). Doctor Aggarwall further testified that the powder that he received contained amobarbital and the liquid that he received contained amobarbital and diazepam.

On March 13, 1981, Alex transported the black bag and its contents to Rhode Island and handed them over to Lieutenant John Reise of the Rhode Island State Police. All of the items found in the January 23, 1981 search were turned over, with the exception of the samples and hypodermic needle

given to Dr. Stock and the pills found in Martha von Bulow's bedroom.

Lieutenant Reise testified that on March 13, 1981, Alex came to Rhode Island State Police headquarters for the purpose of handing over the black bag and its contents. Attorney Kuh and a Detective Joseph Miranda were also present. Alex removed the items from the black bag, and Lieutenant Reise initialed and dated them. Lieutenant Reise prepared a seizure report and placed the items in the evidence room. On March 20, 1981, Lieutenant Reise removed certain of these items from the evidence room and sent them to the state toxicologist for testing. These items included five pills; one clear-glass ampule bearing the name "papaveretum"; one Valium, two milligram, vial containing a white powder; one pill container with a white cap and amber base, believed to contain Valium and possible unknown barbiturates; and one clear-glass ampule with a yellow cap and a blue interior stopper, bearing the name "lidocaine." On April 23, 1981, Detective Miranda, under the direction of Lieutenant Reise, sent an additional pill to the state toxicology laboratory for testing. This substance was later identified by Detective Miranda as one blue pill of Valium Roche-10.

The state continued the investigation, expanding upon the work of Kuh and the others involved in the family's investigation. Their efforts resulted in the indictment, trial, and ultimate conviction of defendant.

The defendant raises several issues on appeal to this court. We find two of them to be dispositive. These are: (1) Whether the trial justice erred in denying defendant access to certain materials in Kuh's possession and (2) whether the trial justice erred by failing to exclude the results of tests performed by state officials upon the contents of the black bag without first obtaining a search warrant.

## I

At the outset, we recognize that initially the facts underlying the rationale of issues relating to attorney-client privilege and work-product privilege were raised in a preliminary hearing in respect to a motion filed by defendant to dismiss the indictment on the ground of private prosecution. The rulings pertinent to these issues were first made at that hearing. We are of the opinion that defendant's claim of private prosecution was utterly without merit. We do not believe that this claim requires either discussion or extended analysis. Consequently, we also recognize that rulings of admission or exclusion of evidence insofar as they relate solely to the claim of private prosecution would be non-prejudicial in their effect. However, these rulings in relation to attorney-client privilege and work-product privilege were repeated and applied without further analysis at various points during the trial on the merits of the case. It is in this context that we address these issues. It will be necessary to discuss facts developed at the preliminary hearing in order to consider the applicability of these privileges to this case.

On September 8, 1981, defendant filed an omnibus motion in the Superior Court requesting various forms of relief, including a request that the indictment be dismissed on the grounds that Kuh's involvement unconstitutionally interfered with the impartiality of the public prosecutor and unconstitutionally influenced the prosecution. In support of this motion and in a general effort to discover the extent of Kuh's involvement in the investigation, defendant called Kuh as a pretrial witness, serving upon him a subpoena duces tecum, which required Kuh to produce certain documents (hereinafter the Kuh documents). In particular, the subpoena directed Kuh to produce (1) telephone records, (2) time records, (3) records relating to work done by investigative agencies, and (4) records relating to interviews of witnesses. Through oral motions and requests and by the questioning of Kuh and Alex, defendant also sought disclosure of other materials, including notes of witness interviews and a summary

of incriminating events turned over to the State Police.

The trial justice denied the oral motions and requests of defendant[1] and sustained objections to questions through which defendant was attempting to elicit information relative to the scope of Kuh's investigation. With regard to the materials requested in the subpoena duces tecum, the trial justice ruled that all the documents withheld by Kuh were protected by the attorney-client privilege[2] or the work-product doctrine. The trial justice then went on to deny defendant's motion to dismiss on the grounds of private prosecution.

The defendant claims that the trial justice erred in denying him access to the Kuh documents. Proper resolution of this issue requires both a careful analysis of these privileges and the application of the principles enunciated therein to the materials sought by defendant below and excluded by the trial justice.

The factual setting in which this claim of error comes before us is somewhat unique in that the materials sought by defendant both before and during trial were generated, not by the prosecution, but by an independent third party.[3] This is significant in that Kuh, a private party, is not subject to the same restrictions or bound by the same obligations as a public prosecutor.

### A. Attorney-Client Privilege

■ We address ourselves initially to defendant's claim that the Kuh documents were not shielded from disclosure by the attorney-client privilege. We have said that "[t]he attorney-client privilege protects from disclosure only the confidential communications between a client and his or her attorney." *DeFusco v. Giorgio*, R.I., 440 A.2d 727, 731 (1982). "The general

rule is that communications made by a client to his attorney for the purpose of seeking professional advice, as well as the responses by the attorney to such inquiries, are privileged communications not subject to disclosure." *Haymes v. Smith*, 73 F.R.D. 572, 576 (W.D.N.Y.1976) (citing *Colton v. United States*, 306 F.2d 633 (2d Cir.1962), *cert. denied*, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963)).

Professor Wigmore has set forth a statement of the general principle of the privilege as follows:

"(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived." 8 Wigmore, *Evidence*, § 2292 at 554 (McNaughton rev. 1961).

■ The United States Court of Appeals for the Fifth Circuit has also commented upon the elements that must be established in order to invoke the attorney-client privilege. In *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir.), *cert. denied*, 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978), the court set forth the requisite elements as

"(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [the] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assist-

---

**1.** Defense counsel renewed his request, at trial, for Kuh's notes of witness interviews. This request was denied by the trial justice.

**2.** Alex testified at the pretrial hearing, on advice of counsel, that he would not waive his attorney-client privilege in regard to the content of his discussions with Kuh and that he would not

consent to the disclosure of materials in Kuh's possession.

**3.** Although Kuh remained involved in the case subsequent to the time the State of Rhode Island began its investigation, we are satisfied that Kuh retained his status as a private party and was not at any time an agent of the state.

ance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client." *See also Status Time Corp. v. Sharp Electronics Corp.*, 95 F.R.D. 27, 29 (S.D. N.Y.1982).

■ It is well settled that the burden of establishing these elements is on the party advancing the privilege. *In Re Horowitz*, 482 F.2d 72, 81–82 (2d Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *see also United States v. Kelly*, 569 F.2d at 938. In the present case, therefore, the burden was on the witness—Alex—to establish the existence of the privilege between himself and Kuh.[4] The trial justice, in finding that the privilege was applicable, apparently was satisfied that Alex had sustained that burden. We disagree.

■ Applying the elements of the attorney-client privilege to the facts contained in the record before us, we are satisfied that an attorney-client relationship did exist between Kuh and Alex. Alex, along with his sister and grandmother, retained Kuh to look into the causes that brought about Mrs. von Bulow's condition. Although defendant argues that Kuh was retained for investigative purposes only and was therefore not consulted for the purpose of obtaining professional legal advice, we feel that the family's reasons for retaining Kuh went beyond that narrow purpose. Implicit in their instructions for Kuh to investigate the circumstances surrounding Martha von Bulow's comatose condition was their desire to obtain a legal opinion from Kuh about whether defendant had engaged in any criminal conduct. Given these facts, we are satisfied that an attorney-client relationship existed at the outset between Kuh and Alex.

Our inquiry, however, does not end here. The attorney-client privilege is limited to communications between the attorney and the client which are expressly intended to be confidential. *Hearn v. Rhay*, 68 F.R.D. 574, 579 (E.D.Wash.1975). "[T]he mere relation of attorney and client does not raise a presumption of confidentiality." *Id.* (citing 8 Wigmore, § 2311 at 182–83). In the present case, however, the record discloses that the communications between Kuh and his clients were initially intended to be kept confidential.

■ The attorney-client privilege is only available when all of the elements, as set forth above, are present. *See International Telephone and Telegraph Corp. v. United Telephone and Telegraph Corp. v. United Telephone Co. of Florida*, 60 F.R.D. 177, 184 (M.D.Fla.1973). An essential element that must be proved in establishing the existence of the privilege is that it has not been waived. Absent such a waiver, the communications to which Kuh and Alex referred would be protected from disclosure since the privilege normally protects a client from having to disclose even the subject matter of confidential communications with his attorney. *United States v. Aronoff*, 466 F.Supp. 855, 861 (S.D.N.Y. 1979). The privilege may be waived, however, when there has been disclosure of a confidential communication to a third party. *Id.* at 862; *see also Status Time Corp. v. Sharp Electronics Corp.*, 95 F.R.D. at 34; *Haymes v. Smith*, 73 F.R.D. at 576; *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 551 (D.C.1981); *State v. Driscoll*, 116 R.I. 749, 757, 360 A.2d 857, 861 (1976).

■ In considering whether there was a waiver of the privilege in this case, we are mindful that the attorney-client privilege operates as a narrow exception to the general rule that every person must offer testimony on all facts relevant to a judicial

---

4. Although Alex, Ala, and Mrs. Aitken initially contacted Kuh, only Alex was questioned at the pretrial hearing regarding the existence of the attorney-client privilege. The state submitted a motion at trial to keep any reference of the attorney-client privilege claimed by any of the clients away from the jury. The trial justice granted the motion and prohibited defense counsel from asking Alex questions that would have revealed that he had invoked and was continuing to invoke the attorney-client privilege.

proceeding. *Edmund J. Flynn Co. v. La-Vay*, 431 A.2d at 551 (citing 8 Wigmore, § 2285). Because the attorney-client privilege limits the full disclosure of the truth, it must be narrowly construed. We shall recognize the privilege, therefore, only if it has not been waived. *Haymes v. Smith*, 73 F.R.D. at 576.

Courts have found waiver of the attorney-client privilege in a variety of situations, including those in which the client has consented to the disclosure and those in which he has not. *See, e.g., In Re Grand Jury Investigation of Ocean Transportation*, 604 F.2d 672, 675 (D.C. Cir.), *cert. denied*, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979). In *Ocean Transportation* the District of Columbia Court of Appeals upheld the denial of a motion for the return of allegedly privileged documents inadvertently disclosed to the Antitrust Division of the United States Department of Justice. The court held that original counsel acted as "agent [for the client] in determining which documents would be produced pursuant to the subpoena and which documents would be withheld under the attorney-client privilege." *Id.* It was clear to the court that "the mantle of confidentiality which once protected the documents [had] been so irretrievably breached [by the disclosure] that an effective waiver of the privilege [had] been accomplished." *Id.*

In the present case, Alex and the other family members instructed Kuh to contact the authorities. Kuh contacted the Attorney General's office by telephone and first met with the Rhode Island State Police on February 25, 1981. At that first meeting, Kuh turned over a type-written summary prepared by him detailing incidents that had led him and the family to conclude that defendant had attempted to kill his wife. He also turned over photocopies of medical records and information concerning defendant's trip to the Bahamas "with someone other than his wife" and generally informed the State Police of information he had obtained from his clients and from Dr.

Stock. Kuh also testified that the summary contained a narration of what he had learned from his interviews of potential witnesses. On March 13, 1981, Kuh accompanied Alex to State Police headquarters, at which time all of the items found in the January 23, 1981 search were turned over, with the few exceptions noted above.

■ These facts clearly indicate that the disclosure of information to the State Police by Kuh was made with the consent of his clients. It is also not unlikely that Alex himself made disclosures concerning the nature of the investigation undertaken by him with the assistance of Kuh and others during the course of his many contacts with the Rhode Island authorities. Notwithstanding the assertions of Kuh and Alex that the nature of Kuh's work was always intended to be kept confidential, the above facts constitute an irrevocable breach of that confidentiality. This breach of confidentiality in our opinion rises to the level of waiver, thereby destroying an essential element of the privilege. In *Ocean Transportation* the court noted that "[a]n intent to waive one's privilege is not necessary for such a waiver to occur." 604 F.2d at 675. This proposition is equally applicable to the case before us. Although confidentiality was initially desired, the family subsequently chose to disclose their suspicions and the information they had obtained to the authorities. That choice is binding, in spite of their initial intentions.

The state argues that in reporting to the authorities, Kuh never disclosed any of the actual confidential communications or documents reflecting these communications. It is the state's position that Kuh simply revealed specific results and facts that were the subject of the communication. These disclosures, the state contends, are distinguishable from the disclosures of actual privileged documents. While we agree that the documents disclosed may not have contained verbatim confidential communications between attorney and client, we are nevertheless satisfied that the disclosure of these documents and the oral disclosures

made by Kuh constituted a waiver of the privilege.

It is not necessary that actual privileged communications or documents reflecting such communications be disclosed to effect a waiver of the privilege. "[A] disclosure of, or even merely an assertion about, the communication may effect a waiver of privilege not only as to that communication, but also as to other communications made during the same consultation and communications made at other times about the same subject." *United States v. Aronoff*, 466 F.Supp. at 862; *see also Status Time Corp. v. Sharp Electronics Corp.*, 95 F.R.D. at 34. In the present case Kuh disclosed, at the very least, the subject matter of communications between himself and his clients. At the very most, Kuh may have disclosed actual communications made by his clients. Kuh testified at the pretrial hearing that he generally informed the State Police of information he had obtained from his clients. In light of this statement, it is difficult to imagine that confidential communications were not disclosed during the course of the ongoing meetings held between Kuh and Alex and between Kuh and the Rhode Island authorities.

Assuming arguendo that actual confidential communications were not disclosed, the extent to which disclosures relating to the subject matter of the attorney-client relationship were made was sufficient to waive the privilege. As the court stated in *United States v. Aronoff*, 466 F.Supp. at 862, this principle has been referred to as "waiver by implication" and it is based on considerations of fairness.

"[W]hen [the client's] conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or to disclose, but after a certain point his election must remain final. 8 Wigmore, supra § 2327, at 636. *See also McCor-*

*mick on Evidence* § 93, at 194 (2d ed. 1972)." *Id.*

Consistent with these principles of fairness, it has been held that the attorney-client privilege properly serves as a shield and not as an offensive tool of litigation. *Edmund J. Flynn Co. v. LaVay*, 431 A.2d at 551; *see also International Telephone & Telegraph Corp. v. United Telephone Co. of Florida*, 60 F.R.D. at 185. The court in *Aronoff* recognized that "[w]here a privilege-holder has made assertions about privileged communications, but has attempted to bar other evidence of those communications, there is a serious danger that his assertions are false or misleading." *United States v. Aronoff*, 466 F.Supp. at 862. "A party may not, therefore, insist upon protection of the privilege for damaging communications while disclosing those which it considers to be favorable to its position." *Edmund J. Flynn Co. v. LaVay*, 431 A.2d at 551; *see also International Telephone & Telegraph Corp. v. United Telephone Co. of Florida*, 60 F.R.D. at 185.

The facts of the present case are a classic example of the impermissible selective use of privileged information. While maintaining that communications were intended to be confidential, Alex and his attorney, at Alex's direction, disclosed information sufficient to trigger an investigation by the state and an indictment. These same parties later refused to disclose other evidence of the same communications. The inequity of allowing the privilege holder in this case to disclose as much as he pleased while withholding the remainder is heightened by the fact that defendant was on trial for attempted murder. The effect of excluding such evidence was therefore to deny defendant access to information that he was entitled to examine in the preparation of his defense.

The defendant also argues that the attorney-client privilege was waived by the presence of third parties at various consultations between Kuh and his clients. To the extent that this claim is borne out by

the record, "the presence of third persons who are not essential to the transmittal of information will belie the necessary element of confidentiality and vitiate the privilege." *Hearn v. Rhay*, 68 F.R.D. at 579. Kuh testified pretrial that a meeting took place on January 22, 1981, at which the possibility of Alex's returning to Newport to search for the black bag was discussed. Kuh also testified that Mr. Gurley (the family's financial advisor) may have been present for all or part of that meeting. If such was the case, Mr. Gurley's presence at that meeting would have destroyed the necessary element of confidentiality, thereby effectuating a waiver of the privilege in respect to those communications.

The defendant argues further that the privilege was waived by the courtroom testimony of Alex and Kuh. It has been held that although

> "the client does not waive the privilege by testifying generally in the cause or testifying as to facts which were the subject of consultation with his attorney, if the client or his attorney at his instance takes the stand and testifies to privileged communications in part this is a waiver as to the remainder of the privileged consultation or consultations about the same subject." *International Telephone and Telegraph Corp. v. United Telephone Co. of Florida*, 60 F.R.D. at 185–86. *See also DeFusco v. Giorgio*, R.I., 440 A.2d at 731.

In the present case, both Alex and Kuh testified at the pretrial hearing about the nature and purpose of Kuh's retention by the family. This is the very fact that was initially intended to be maintained in confidence and subsequently disclosed. This testimony may have been sufficient, in and of itself, to waive the privilege with respect to the remainder of the consultations about this same subject.

A finding of waiver, however, does not depend upon the presence of third parties at consultations between Kuh and his clients or the courtroom testimony of Kuh and Alex. These events do, however, highlight the great extent to which disclosures were made in this case. It is our opinion that far too much was disclosed. As Professor Wigmore has stated, the privilege holder "may elect to withhold or to disclose, but after a certain point his election must remain final." 8 Wigmore, § 2377 at 636. That point was reached in the present case. The trial justice was clearly wrong, therefore, in finding that the Kuh documents were protected by the attorney-client privilege.

The state concedes that the attorney-client privilege does not apply to communications between Kuh and Maria Schrallhammer, Morris Gurley, Dr. Richard Stock, and Charles Roberts. They also concede that Kuh's time and telephone records, the medical records from Newport Hospital, the summary of incriminating evidence prepared by Kuh, and the reports of private investigative agencies "do not fall under the protective umbrella of the attorney-client privilege." We agree. However, to the extent that any of these documents reflect confidential communications between attorney and client, they would have come within the ambit of the attorney-client privilege had that privilege not been waived. *See Colton v. United States*, 306 F.2d 633, 639 (2nd Cir.1962); *see also In Re Sealed Case*, 676 F.2d 793, 807 (D.C.Cir. 1982).

### B. Work-Product Privilege

It is the state's position that any documents not protected by attorney-client privilege are protected by the work-product doctrine. We disagree.

The work-product doctrine was first defined in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The privilege protects certain materials "obtained or prepared by an adversary's counsel with an eye toward litigation * *." *Id.* at 511, 67 S.Ct. at 394, 91 L.Ed. at 462. *Hickman* was recently addressed by the District of Columbia Circuit Court of Appeals in the context of a grand jury investigation in *In Re Sealed Case*, 676 F.2d 793

(D.C.Cir.1982). In that case the court observed that

"[i]n *Hickman* the Supreme Court read into the Federal Rules of Civil Procedure then in effect a two-tiered protection from discovery for attorney work product * * *. To the extent that work product contains relevant, nonprivileged facts, the *Hickman* doctrine merely shifts the standard presumption in favor of discovery and requires the party seeking discovery to show 'adequate reasons' why the work product should be subject to discovery. However, to the extent that work product reveals the opinions, judgments, and thought processes of counsel, it receives some higher level of protection, and a party seeking discovery must show extraordinary justification." *Id.* at 809–10.

The work-product doctrine does not, however, provide an absolute privilege. As the court stated in *In Re Sealed Case*, the *Hickman* Court "scrupulously avoided recognizing a general privilege for work product." *Id.* at 810. *See also United States v. Nobles*, 422 U.S. 225, 237–38, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141, 153 (1975); *Fireman's Fund Insurance Co. v. McAlpine*, 120 R.I. 744, 754, 391 A.2d 84, 90 (1978).

In *United States v. Nobles*, 422 U.S. at 238, 95 S.Ct. at 2170, 45 L.Ed.2d at 153, the Supreme Court recognized a privilege for work product in criminal discovery. *In Re Sealed Case*, 676 F.2d at 810; *In Re Grand Jury Subpoena Dated July 13, 1979*, 478 F.Supp. 368, 374 (E.D.Wis.1979). The Court found that the privilege was waived, however, when the holder of the privilege elected to adduce testimony from an investigator about the contents of an allegedly privileged report. *United States v. Nobles*, 422 U.S. at 239–40, 95 S.Ct. at 2170–71, 45 L.Ed.2d at 154.

■ As noted above, the state relies upon both the attorney-client and the work-product privileges to support the ruling of the trial justice. Of the two, the work-product privilege is broader. *United States v. Nobles*, 422 U.S. at 238 n. 11, 95 S.Ct. at 2170 n. 11, 45 L.Ed.2d at 153 n. 11; *In Re Sealed Case*, 676 F.2d at 808. The attorney-client privilege covers only confidential communications between attorney and client. The work-product privilege, on the other hand,

"protects both the attorney-client relationship and a complex of individual interests particular to attorneys that their clients may not share. And because it looks to the vitality of the adversary system rather than simply seeking to preserve confidentiality, the work product privilege is not automatically waived by any disclosure to a third party." *In Re Sealed Case*, 676 F.2d at 809.

■ Although the purposes of the work-product privilege are more complex than those of the attorney-client privilege and may not be inconsistent with selective disclosure, at some point the privilege must yield to the needs of the adversary system. *See In Re Sealed Case*, 676 F.2d at 818. This consideration is of paramount importance in the criminal context. In the criminal justice system, the work-product doctrine serves to protect "[t]he interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence * * *." *United States v. Nobles*, 422 U.S. at 238, 95 S.Ct. at 2170, 45 L.Ed.2d at 153. As with the attorney-client privilege, when a party seeks to use the work-product privilege in a manner inconsistent with this purpose, courts are justified in finding a waiver where selective disclosure would prevent the system from fairly and accurately resolving the question of guilt or innocence. *See In Re Sealed Case*, 676 F.2d at 818.

■ Applying these principles to the present case, we must initially determine whether the work-product doctrine is applicable in the first instance. In light of *Nobles*, there is no question that the privilege is applicable in the criminal context. Our initial inquiry becomes, therefore, whether or not the allegedly privileged ma-

**1010**

terial was obtained or prepared in anticipation of litigation. The state correctly asserts that the work-product privilege has been held to protect materials prepared in anticipation of litigation other than the specific litigation in which its disclosure is sought. *See In re Murphy*, 560 F.2d 326, 334 (8th Cir.1977); *United States v. Capitol Service, Inc.*, 89 F.R.D. 578, 585–86 (E.D.Wis.1981).

In the present case, the state contends that the prospect of litigation was evident during the time in which the alleged work product was being created. Such prospective litigation, it is argued, included possible litigation over Mrs. von Bulow's estate, a conservatorship proceeding for Mrs. von Bulow, a civil action for wrongful death, and representation of Kuh's clients before the grand jury and at a subsequent criminal trial. In light of the foregoing authority, we cannot say with certainty that the material in question was not prepared in anticipation of litigation. Even assuming that the civil litigation was not anticipated, it is our opinion that the possibility of a criminal trial was evident from the beginning. Also, the fact that Kuh did not represent a party to the proceedings should not, in and of itself, render his work product subject to disclosure. *See Grumman Aerospace Corp. v. Titanium Metals Corp. of America*, 91 F.R.D. 84, 88–89 (E.D.N.Y.1981); *Vilastor-Kent Theatre Corp. v. Brandt*, 19 F.R.D. 522 (S.D.N.Y. 1956).

Assuming without deciding, therefore, that the Kuh documents were obtained or prepared in anticipation of litigation, we must now determine to what extent these documents are "the sort of 'memoranda, * * * mental impressions,' and 'thoughts, heretofore inviolate' for which the *Hickman* doctrine was fashioned." *In Re Sealed Case*, 676 F.2d at 811.

The subpoena issued to Kuh called for the production of (1) telephone records, (2) time records, (3) records relating to work done by investigative agencies, and (4) records relating to interviews of witnesses.

Defense counsel also requested, inter alia, the production of the summary report turned over to the State Police.

We shall focus initially upon Kuh's notes of witness interviews. These notes clearly fall within the definition of opinion work product. The Supreme Court has said, in the context of the disclosure of witness statements under the Jencks Act, that to the extent an attorney has recorded his own thoughts in his interview notes, the notes would seem to come within the work-product immunity. *Goldberg v. United States*, 425 U.S. 94, 106, 96 S.Ct. 1338, 1346, 47 L.Ed.2d 603, 615 (1976). In *In Re Grand Jury Subpoena Dated July 13, 1979*, 478 F.Supp. at 374, the court found that interview memoranda prepared by counsel in an internal investigation conducted in anticipation of potential civil and criminal litigation were protected by the work-product doctrine as defined in *Hickman*. The court concluded both that government attorneys did not make a sufficient showing to justify discovery of these memoranda and that *Hickman* supports the conclusion that "interview memoranda may be discovered only in a 'rare situation.'" *Id.* at 375. It is therefore incumbent upon us to determine whether the case before us presents such a "rare situation" in which interview memoranda should be disclosed. We feel that it does.

Although there is no per se waiver rule in the work-product area, *see Grumman Aerospace Corp. v. Titanium Metals Corp. of America*, 91 F.R.D. at 89, we feel justified in finding an implied waiver of the privilege in this case. Professor Wigmore has commented, in the context of the attorney-client privilege, that "the privilege of secret consultation is intended only as an incidental means of defense, and not as an independent means of attack, and to use it in the latter character is to abandon it in the former." 8 Wigmore, § 2327 at 638. We find that the selective disclosure of alleged work product in the present case was precisely the sort of independent at-

tack that constituted an abandonment of the privilege.

On the basis of the record before us, we have no way of knowing to what extent information obtained by Kuh from interviews with prospective witnesses was disclosed to the Rhode Island authorities. We do know, however, that from the outset Kuh and his clients, by choice selectively disclosed information sufficient to help the state build its case against defendant while relying on one privilege or the other to prevent the flow of potentially relevant evidence to defendant. This selective use of allegedly privileged material cannot be said to have promoted the interests of society or defendant in reaching a fair or accurate resolution of the question of guilt or innocence.

An example of the unfair use of information allegedly protected by the work-product doctrine occurred near the end of the trial when Kuh took the stand as a rebuttal witness. The state called Kuh to impeach the testimony of Charles Roberts, the family chauffeur, which indicated that Mrs. von Bulow was receiving frequent prescriptions for various medications from several doctors. Kuh testified that information that he had obtained from Roberts at a prior meeting was inconsistent with his testimony in court. There is also evidence that Kuh relied upon the very interview notes that he had previously refused to disclose to buttress this alleged inconsistency.[5]

Selective use of the privilege can also be seen in the use of the summary of incriminating events which was turned over to the State Police by Kuh and subsequently denied to defendant. Although the document is not before us, Kuh testified that it contained a narration of what he had learned from his investigation, including information obtained from his interviews of potential witnesses. To the extent that the summary contained Kuh's own thoughts or mental processes in synthesizing the information, it would be entitled to work-product protection, *see Goldberg v. United States*, 425 U.S. at 106, 96 S.Ct. at 1346, 47 L.Ed.2d at 615, absent its waiver. However, when the disclosure of this evidence is viewed in conjunction with all of the other disclosures made by Kuh, including those discussed in the context of the attorney-client privilege, we find that pattern of controlled and aggressive use of allegedly privileged material which necessarily waives the privilege.

We note that reports of investigative agencies are also work product, *United States v. Nobles*, 422 U.S. at 238–39, 95 S.Ct. at 2170, 45 L.Ed.2d at 154, and would be entitled to protection in the absence of waiver. They are not, however, opinion work product since they do not reflect the judgments and thought processes of counsel. They may be discovered, if relevant, upon a showing of adequate reasons. *See In Re Sealed Case*, 676 F.2d at 809. Telephone and time records would fall into the same category. Although it is unclear to what extent defendant was prejudiced by the denial of access to these documents, they nevertheless came within the protective umbrella of the trial justice's ruling.

We addressed the work-product privilege in the civil context in *Fireman's Fund Insurance Co. v. McAlpine*, 120 R.I. 744, 391 A.2d 84 (1978). In that case we stated that the party seeking production has the burden of showing that a denial of production or inspection will result in an injustice or undue hardship. The ultimate determination of that issue is vested in the sound discretion of the trial justice. *Id.* at 754, 391 A.2d at 90.

The injustice and hardship to defendant in the present case is clear. The effect of denying him access to the requested materials was to block the flow of potentially relevant evidence that may have been vital

---

5. Defense counsel requested a side-bar conference when Kuh was called. During that conference defense counsel asked the prosecutor if Kuh had obtained a written statement from Roberts. The prosecutor responded, "I don't think there's a written statement, no, but I think he has notes on it."

to his defense. The work-product doctrine was initially set forth as a limitation on civil discovery. Although that doctrine also serves a purpose in the criminal context, we shall not subject the needs of a criminal defendant to the same hard and fast application of the civil rule. We find, therefore, that the trial justice abused his discretion in ruling that the requested documents were protected by the work-product privilege.

*McAlpine* also stands for the proposition that discoverable matter must be both relevant and not privileged. *Id.* at 747, 391 A.2d at 86. Ordinarily, therefore, we would remand this case to the trial court with instructions to examine the documents in question, in a manner consistent with this opinion, to determine (1) which of the documents are not privileged and (2) which unprivileged documents are relevant. Our use of such a remand in this case is precluded, however, by our disposition of defendant's search and seizure claims.

## II

### A. *Private vs. Public Searches*

 The activities of Alex and Lambert in entering Clarendon Court on January 23, 1981, to locate the black bag included their search of defendant's closet, bathroom, desk, and study. Despite defendant's vigorous assertion that the prior involvement of Attorney Kuh was so extensive as to make this search governmental, we are not persuaded that the strictures of the Fourth Amendment should apply to their entry and search that day. Alex and Lambert's conduct "did not implicate the Fourth Amendment * * * because the constitutional prohibition of unreasonable searches and seizures applies only to governmental conduct." *State v. Eiseman*, R.I., 461 A.2d 369, 374 (1983) (citing *Burdeau v. McDowell*, 256 U.S. 465, 475, 41

S.Ct. 574, 576, 65 L.Ed. 1048, 1051 (1921)). No matter how egregious their actions may appear in a society whose fundamental values have historically included individual freedom and privacy, the exclusionary rule cannot be invoked by defendant to bar the introduction of evidence that was procured by Alex and Lambert while acting as private citizens. "The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim * * *," *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561, 571 (1974); *State v. Spratt*, 120 R.I. 192, 193–94, 386 A.2d 1094, 1095 (1978), but rather to deter unconstitutional methods of law enforcement. *United States v. Janis*, 428 U.S. 433, 446–47, 96 S.Ct. 3021, 3028–29, 49 L.Ed.2d 1046, 1056–57 (1976); *State v. Carillo*, R.I., 407 A.2d 491, 496 (1979); *State v. Spratt*, 120 R.I. at 194, 386 A.2d at 1095.

Similar principles do not, however, govern our review of the evidence-gathering techniques employed by the state. Our decision in *State v. Eiseman*, R.I., 461 A.2d 369 (1983), requires our application of an analysis that clearly separates the Fourth Amendment standards to be applied to the private search of Clarendon Court on January 23, 1981, from those governing the subsequent chemical testing of certain fruits of that search by the Rhode Island State Police.[6] In *Eiseman* we held that when the government significantly expands a prior private search without first procuring a search warrant and no recognized exception to the warrant requirement exists to justify such expansion, the independent governmental search is subject to the proscriptions of the Fourth Amendment, *State v. Eiseman*, R.I., 461 A.2d at 377.

### B. *Warrant Requirement*

 At the outset, two specific points should be made. First, there is no dispute about the fact that the state failed

---

**6.** As previously noted, all of the fruits of Alex and Lambert's search, except those samples given to Dr. Stock and the pills found in Martha von Bulow's bedroom, were delivered to the Rhode Island State Police by Alex on March 13, 1981. This evidence was inventoried and stored in the State Police evidence room until March 20, 1981, the date on which Lieutenant Reise ordered that certain samples be removed from it and sent to the state toxicology lab for testing.

to obtain a warrant before chemically testing the pills received from Alex. Indeed, under cross-examination by defense counsel, Lieutenant Reise plainly admitted that this subsequent chemical testing was performed without the state's first having obtained a search warrant. Second, there is no evidence in the record to support a finding that any recognized exception to the warrant requirement existed to justify the chemical testing.[7] Despite this conspicuous absence, however, the state urges on appeal that two specific exceptions to the warrant requirement should be applied here.[8] One of these two exceptions, the plain-view doctrine, we can summarily dismiss. We have previously rejected this doctrine as totally nonviable in an expansion case. "The plain-view doctrine validates the warrantless *seizure* of evidence." *State v. Eiseman,* R.I., 461 A.2d at 380 (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 464–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564, 581–83 (1971)). It cannot be used "to justify conduct that *may* constitute a 'significant expansion' of the private search." *State v. Eiseman,* R.I., 461 A.2d at 381.

■ The other warrant exception claimed by the state, "harmless error," is equally without merit. "A determination of whether error is harmless must turn upon whether there is a reasonable possibility that the error complained of contributed to the conviction. Before a federal constitutional error can be held harmless, we must be able to declare a belief that it was harmless beyond a reasonable doubt." *State v. Robalewski,* R.I., 418 A.2d 817, 824

(1980) (citing *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–11 (1967); *State v. Lachapelle,* 112 R.I. 105, 113, 308 A.2d 467, 471 (1973)).

■ Even cursory review of the record precludes such a declaration. Unlike the situation in *State v. Robalewski,* R.I., 418 A.2d 817 (1980), in this case there is no direct evidence to connect defendant with the two alleged murder attempts upon his wife. In *Robalewski,* the most recent case in which we applied a "harmless error" exception to the Fourth Amendment's warrant requirement, strong eyewitness testimony of an assaulted security guard constituted sufficient direct evidence to convict the defendant without the introduction of the tainted revolver at trial. In fact, in that case, Officer Superczynski's testimony "was the core of the state's case against defendant." *Id.* at 824. The precisely opposite situation prevails here. The state's entire case is predicated upon circumstantial evidence. These chemical tests of certain contents of the black bag formed a significant part of the state's case. Not only did the circumstantial evidence suggest that defendant had injected his wife with insulin by means of a hypodermic needle, but it also implied that defendant may have anesthetized her prior to such an injection. The importance of these chemical tests is demonstrated by the fact that the state explicitly relied upon the results of these tests to prove its theory of the case. A clear illustration of this reliance can be found in an excerpt from the prosecutor's own remarks made during closing argument:

---

7. This chemical testing did not involve consent by defendant, (*State v. Locke,* R.I., 418 A.2d 843, 847 (1980)), nor can it be viewed as a search incident to defendant's lawful arrest (*Id.*), an automobile search of his car (*New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981)), an administrative inspection of his home (*Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)), or a border search (*United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977)).

8. In its initial brief filed with this court, the state specifically claimed that the admission of the chemical testing of one red capsule was harmless beyond a reasonable doubt. In its reply brief, the state tacitly embraced the plain-view exception in its discussion of *Illinois v. Andreas,* — U.S. —, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983), as further justification for the chemical testing.

" * * * [O]ne of the capsules which was found inside the Dalmane bottle which is marked Secobarbital, actually contains not only Secobarbital, but Amobarbital and Cyclizine. I just don't know, for the life of me, what the significance of that is, but I just can't see if that drug belonged to Martha von Bulow, why she would take a capsule and mix in some other drugs with it. It is only consistent with the surreptitious or the secreted administration of drugs on the part of another person.

"It would have been very easy, ladies and gentlemen, for Claus von Bulow to anesthetize his wife, to drug his wife at any point in time, and especially prior to—just prior to giving her the injection on each of these occasions, December 27th of 1979 and December 21st—excuse me, December 26th of 1979 and December 20th of 1980. On both of those evenings, there's testimony that she came home from the movies on the second occasion and went into the bathroom. He was in the study. She had a headache. Very simple. 'Can I get you a glass of water, Dear?' It would have been so easy for him to put some of that powder Amobarbital found in his pocket or in the desk * * * the powder Amobarbital and the little French Valium, spike it a little bit. Very easy for him to do that."

Consequently, the presence of the tranquilizing and anesthetic drugs in the black bag and their positive identification by the state toxicologist[9] firmly tightened the web of circumstantial evidence around which the state had woven its case against defendant. At a minimum, the admission by the trial justice of the results of the tests performed by the state toxicologist created a reasonable possibility that defendant would be convicted. *Id.*[10]

9. The state toxicologist in charge of the Law Enforcement Laboratory, Mr. Robert A. Miller, testified that he chemically analyzed the substances delivered to him by the State Police. The results of that testing follow:

1. One red capsule marked Lilly F–40 found to contain secobarbital, amobarbital and cyclizine.

2. One blue capsule marked Lilly F–33 found to contain amobarbital.

3. One yellow capsule found to contain flurazepam, a benzodiazepine-type drug which is similar to a sedative and of the same class as Valium.

4. One light blue tablet found to contain diazepam, the generic name for Valium.

5. One light orange tablet containing Inderal. (This is a noncontrolled substance. This tablet was not chemically analyzed. Rather, it was identified on the basis of a physical examination).

6. One clear-glass ampule bearing the name papaveretum, the liquid therein found to contain morphine and codeine.

7. One Valium, two milligram, vial containing white powder with red speckles. This powder was found to contain amobarbital.

8. One pill container with a white cap and amber base believed to contain Valium and possible unknown barbiturates suspended in an unknown liquid. Tests showed the presence of diazepam (Valium).

9. One clear-glass container with a yellow cap and a blue interior stopper found to contain Lidocaine Hydrochloride, a non-controlled substance classified as a local anesthetic, and having other uses.

10. One blue pill marked Valium Roche-10 found to contain diazepam (Valium).

10. Without question, the presence of the insulin upon the needle that had been determined as a result of the private test performed by the Bio-Science Laboratory in Columbia, Maryland, was of greater probative value than the identity of the other substances examined by the state toxicologist. Nevertheless, these pills, containing various controlled substances whose identities were only determined by the state's having expanded upon the initial private search, cannot be said to have been harmless beyond a reasonable doubt.

Nothing we have stated in this opinion should, however, be construed to indicate that the private tests conducted at the request of Dr. Stock at the Bio-Science Laboratories upon the needle that had been removed by Alex from the black bag were in any way tainted by the conduct of the Rhode Island State Police in respect to the other contents of the bag. It is clear that the state did not rely upon its own independent test of the needle. Thus, we do not suggest that the results of the tests performed at Bio-Science Laboratories were not properly admitted under the doctrine of private search enunciated in *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921).

## C. *State Expansion of Private Search*

 Because no warrant was procured to authorize the chemical testing and no exception to the warrant requirement exists to justify its absence, the admission of these test results by the trial justice can only be permitted if it is determined that the subsequent testing was not a significant expansion of the prior private search. Although we decided in *Eiseman* that a remand to the trial justice was the proper procedure to follow in making such a determination, adopting the same course of action in this case would be inappropriate. Our remand in *Eiseman* was necessary because the trial justice's ruling was "inadequately definitive for our review." *State v. Eiseman*, R.I., 461 A.2d at 377. Specifically, we were unable to ascertain in that case whether the trial justice made a specific finding that the subsequent state testing was an independent governmental search. *Id.* This case presents no such difficulty. We are confronted here with a situation in which the trial justice made the requisite findings concerning the "significant expansion doctrine" first enunciated in *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980).[11] Therefore, his findings and ruling upon defendant's motion to suppress are sufficiently specific to be final for purposes of our review.

The essential facts in *Eiseman* are virtually identical to those present in *United States v. Jacobsen*, —— U.S. ——, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).[12] The Court's majority opinion, authored by Justice Stevens, specifically held that in cases in which (1) a field test "could disclose only one fact previously unknown to the agent—whether or not a suspicious white powder was cocaine," *Id.* at ——, 104 S.Ct. at 1661, (2) there was "no other arguably 'private' fact," *Id.* at ——, 104 S.Ct. at 1662, and (3) it was virtually certain that the powder could have been nothing but contraband, *Id.* at —— n. 17, 104 S.Ct. at 1660 n. 17, the Fourth Amendment did not require the agent to obtain a warrant before conducting the field test. *Id.* at ——, 104 S.Ct. at 1662.

Consequently, had Steven Eiseman come before this court subsequent to the Supreme Court's *Jacobsen* decision, our conclusion upon his Fourth Amendment claim would have been quite different. If one assumes the field test at issue in *State v. Eiseman*, R.I., 461 A.2d 369 (1983) could only reveal one fact—the presence or absence of cocaine—his appeal would not have been remanded to the trial justice for specific findings concerning the degree of governmental expansion of the prior private search. If *Jacobsen* had been the law of the land on June 10, 1983, Steven Eiseman's allegations of Fourth Amendment violations would have been dismissed. The mandate of *Jacobsen* is explicit—field tests for cocaine performed under factual circumstances similar to those that existed in *Eiseman* do not constitute a significant expansion of a private search.

Notwithstanding the direct effect that the decision of *United States v. Jacobsen* would have had upon the result we reached in *State v. Eiseman*, R.I., 461 A.2d 369 (1983), the principles we announced in *Eiseman*, including our enunciation of the four factors to be considered in analyzing an expansion case, remain completely viable in non-field-test situations. Our decision in

---

**11.** In ruling upon defendant's motion to suppress, the trial justice specifically found that (1) the activities of the State Police, including the toxicological testing, did "not involve a search within the meaning of the Fourth Amendment" and (2) even if this toxicological examination was a search, it was not unreasonable under the totality of the circumstances.

**12.** Both cases involved a warrantless field test performed upon a white powder that an employee of Federal Express, a private freight carrier, discovered inside a wrapped package in transit. In each case, the Drug Enforcement Agency was notified of the discovery, and an agent was dispatched to investigate it. The agent conducted a field test that revealed the substance discovered as cocaine. The package was then rewrapped and the carrier directed to deliver it to the respective defendant-addressee.

*Eiseman* owes its genesis to the Supreme Court's opinion in *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). Indeed, the doctrines we enunciated in *Eiseman* reflect this court's attempt to provide explicit guidance to a trial justice who is confronted with an expansion case. The Court's recent decision in *United States v. Jacobsen,* —— U.S. ——, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), not only is fully consistent with its earlier pronouncement in *Walter* but it actually also incorporates verbatim the doctrines previously announced therein. *Id.* at ——, 104 S.Ct. at 1659. In our view, *United States v. Jacobsen* does not in any way reflect the Court's abandonment of the expansion analysis it first defined in *Walter,* but rather represents a clear affirmance by the Court of the theoretical legitimacy of that doctrine in analyzing an expansion case. As Justice Stevens's opinion demonstrates, at least six justices of the Court are "of the view that the legality of the governmental search must be tested by the scope of the antecedent private search." *United States v. Jacobsen,* —— U.S. at ——, 104 S.Ct. at 1658. *United States v. Jacobsen* thus reaffirms the applicability of the *Walter* principles to those situations in which the government expands upon a lawful private search.

The mandate of *United States v. Jacobsen* is that field tests conducted under factual circumstances similar to those present in that case do not constitute a significant expansion of a lawful private search. This appeal does not involve a field test at all. The chemical testing that defendant here challenges occurred, not in the field immediately following a lawful private search, but rather in the state toxicology laboratory one week after its delivery to the State Police. The pills tested by the state in this case were not even in transit—they were totally at rest in State Police hands, having been inventoried and locked in the State Police evidence room one week prior to their warrantless testing.

Secondly, the actual chemical tests performed by the state toxicology laboratory were substantially more extensive than that executed by the agent in *Jacobsen.* In the present case, the tests performed upon certain contents of the black bag clearly could reveal more than just whether these substances were contraband. Indeed, these tests positively identified the exact chemical composition of a myriad of substances whose identities were previously unknown to the state.[13] This is not a case in which the tests involved could only reveal one fact and "no other arguably 'private' fact." *United States v. Jacobsen,* —— U.S. at ——, 104 S.Ct. at 1662.

The third major difference between the case at bar and *United States v. Jacobsen,* —— U.S. ——, 104 S.Ct. 1652, 80 L.Ed.2d 85, is that, in *Jacobsen,* it was a virtual certainty that the substances tested contained contraband and nothing else. *Id.* at —— n. 17, 104 S.Ct. at 1660 n. 17. The evidence in this appeal demonstrates that of all the substances tested by the State Police, only one could not have been purchased with a doctor's prescription in a pharmacy in the condition in which it was found. Additionally, most, if not all, of the substances tested here were found in standard medicine bottles and vials. They were clearly not discovered in such a condition— for example, inside four zip-lock glassine bags placed inside a ten inch tube of silver tape in a cardboard box wrapped in brown paper—as would make it a virtual certainty "that [they] contained nothing but contraband." *Id.*

A fourth distinction between *Jacobsen* and the case at bar lies in the fact that in *Jacobsen* the field test represented a genuine law-enforcement technique employed to restrict the possession of a Congressionally condemned substance—cocaine. *Id.* at ——, ——, 104 S.Ct. at 1656, 1662. As

---

**13.** As our later discussion demonstrates, the state police had nothing more than vague, subjective suspicions concerning the identity of certain substances that it received from Alex prior to their chemical testing.

Justice Stevens's opinion directly acknowledged, the *Jacobsen* decision "is confined to [those cases involving] possession of contraband." *Id.* at —— n. 23, 104 S.Ct. at 1662 n. 23. Unlike *Jacobsen,* the present case presents no exigent circumstances to legitimize the employment by the State Police of a warrantless law-enforcement technique. Nor does it clearly involve the possession of illegal substances. There is no evidence in the record to indicate that the State Police knew that these substances were unlawfully in the possession of defendant prior to the time that they were delivered to the State Police.

In light of the substantial differences between the facts in *Jacobsen* and those in the case at bar and because of our conclusion that the principles announced in *Eiseman* retain complete vitality in non-field-test expansion cases even subsequent to the *Jacobsen* decision, defendant's Fourth Amendment claims must be analyzed in a manner consistent with the *Eiseman* test.

█ In *Eiseman* we enunciated four specific factors to consider in determining whether a governmental expansion of a private search is so significant as to invoke the protection of the Fourth Amendment. Applied to this case, these include the following:

1. The police officer's experience and expertise.

2. The question of whether in light of his expertise, the officer had formed an opinion with a reasonable degree of certainty concerning the identity of the substance previously searched by private parties before expanding the search.

3. The extent of the intrusion required to perform the expansion.

4. The question of whether such intrusion impinged upon any further expectation of privacy that remained after the exposure of the contents by private persons. *See State v. Eiseman,* R.I., 461 A.2d at 377.

Having reviewed the evidence in light of these factors, we are convinced that all four militate against the trial justice's conclusion and in favor of our finding that the state's subsequent toxicological examination was a significant expansion of the private search subject to the protection of the Fourth Amendment.

Lieutenant Reise and his subordinate, Detective Miranda, both had extensive experience with the State Police. Reise was a twenty-one year veteran of the State Police and a ten-year member of its detective division. Miranda had been employed by the State Police since 1969 and had been working in its detective division since 1974. Additionally, Reise was thoroughly familiar with the proper procedure to follow to obtain a search warrant to advance an investigation.

Despite his expertise, Lieutenant Reise was unable to identify with a reasonable degree of certainty those substances that he had received from Alex without further testing. His testimony is replete with admissions that he sent samples to the state lab because he simply did not know what they were. In spontaneous response to two questions posed by the prosecutor upon direct examination, Lieutenant Reise gave virtually identical answers to explain why he ordered the testing: "I had no idea what it was" (papaveretum); I sent it "[f]or the same reason I just didn't know what it was" (lidocaine). And on subsequent cross-examination, Lieutenant Reise reaffirmed the fact that he ordered the chemical analysis of certain substances precisely because he lacked knowledge of their identity. He stated that the reason he had had the state lab perform the testing was because there were "some unknowns in there that I couldn't identify just through a Physicians Desk Reference." Although he did testify that he felt certain substances delivered by Alex were "a contraband substance or something of that nature," a full reading of his testimony convinces us that these statements were nothing more than an expression of his own vague, subjective suspicions about their identity. These statements clearly do not support a finding

that Lieutenant Reise was able to identify the substances delivered by Alex with any reasonable degree of certainty without the aid of the state toxicological tests.

The final two *Eiseman* factors we shall consider in tandem. The extent of the intrusion and whether it impinged upon a further expectation of privacy retained by defendant are two integrally related factors. If defendant retains a constitutionally protected expectation of privacy in the items delivered to the state by private parties, and the state intrudes upon that expectation of privacy, it does so subject to the proscription of the Fourth Amendment.

In this case defendant originally possessed a reasonable expectation of privacy in the pills and other contents of the black bag. These items were originally found in an opaque black bag inside a metal box in a locked closet in defendant's home. The fact that they were unexpectedly seized, inspected, and delivered to the State Police by a private party does not alter defendant's legitimate original expectation of privacy. *Walter v. United States*, 447 U.S. at 658–59, 100 S.Ct. at 2402–03, 65 L.Ed.2d at 418–19.

▇▇▇ "[T]he Government may not exceed the scope of the private search unless it has the right to make an independent search." *Id.* at 657, 100 S.Ct. at 2402, 65 L.Ed.2d at 418. Consequently, unless the private inspection and testing of the black bag and its contents was so complete as to be virtually coextensive with the State Police search, it only partially frustrated defendant's original expectation of privacy. "It did not * * * strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection." *Walter v. United States*, 447 U.S. at 659, 100 S.Ct. at 2403, 65 L.Ed.2d at 419.

The facts of this case readily demonstrate that the state's toxicological examination of the contents of the black bag did exceed the scope of the private tests performed by Bio-Science Laboratories at the request of Dr. Stock. In addition to the chemical analysis of both the blue liquid and the white powder performed by Dr. Stock, the state toxicologist chemically analyzed five samples of pills, including three capsules and two tablets, and two samples of ampules that were never tested by Dr. Stock. The state concedes that one of these capsules, a red capsule marked "Lilly F–40," could not have been identified by a simple sight examination.[14]

The state therefore did intrude upon a further expectation of defendant's privacy. The extent of the state's intrusion is significant because, without it, the initial view of the objects tested produced only an inference of criminal conduct by defendant. *See id.* at 657, 100 S.Ct. at 2402, 65 L.Ed.2d at 418; *see also United States v. Jacobsen*, ___ U.S. ___, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). In this case, as in *Walter*, the state exceeded the scope of the private search by employing chemical or mechanical means to reveal the hidden nature of these objects. This governmental activity represents a significant expansion of the private search because it positively identified the unknown composition of the pills delivered to the state police. *See State v. Morgan*, 32 Wash.App. 764, 768, 650 P.2d 228, 231 (1982). This additional investigation, being "necessary in order to obtain the evidence which was to be used at trial," *Walter v. United States*, 447 U.S. at 654, 100 S.Ct. at 2400, 65 L.Ed.2d at 416, was an independent search subject to the Fourth Amendment.

▇▇▇ Since we hold that the state's subsequent chemical analysis of certain contents of the black bag was a significant expansion of the private search and that there were no exceptions to the warrant requirement, defendant's conviction must be reversed. In a case in which "the au-

---

**14.** Although labeled "Lilly F–40" (a capsule which would normally contain seconal), this capsule as we have noted, was found to contain secobarbital, amobarbital, and cyclizine. This same capsule could not have been bought at a drug store in the condition in which it was found.

thorities have not relied on what is in effect a private search, * * * [they] presumptively violate the Fourth Amendment if they act without a warrant." *United States v. Jacobsen*, —— U.S. at ——, 104 S.Ct. at 1659. The state may not significantly expand the scope of a private search unless it obtains a warrant. *State v. Eiseman*, R.I., 461 A.2d at 381.

### III.

█ Even were we to hold that defendant's Fourth Amendment rights had not been violated by the State Police's chemical testing, our own constitutional prohibition against unreasonable searches and seizures mandates that the evidence obtained through the state's toxicological examination of the contents of the black bag be suppressed. Article I, sec. 6, of the Rhode Island Constitution is an alternative, independent foundation upon which we rest our holding that the toxicological testing was an illegal search. That section constitutes "bona fide separate, adequate, and independent grounds," *Michigan v. Long*, —— U.S. ——, ——, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983), upon which we base our decision to suppress the admission of evidence procured by the state's toxicological analysis.

This court has previously recognized that the citizens of Rhode Island possess "a double barrelled source of protection which safeguards their privacy from unauthorized and unwarranted intrusions: the [F]ourth [A]mendment of the Federal Constitution and the Declaration of Rights which is specified in the Rhode Island Constitution." *State v. Sitko*, R.I., 460 A.2d 1, 2 (1983) (quoting *State v. Luther*, 116 R.I. 28, 29, 351 A.2d 594-95 (1976)). This dual safeguard flows directly from the United States Supreme Court's explicit acknowledgement of the "right of state courts, as final interpreters of state law, 'to impose higher standards on searches and seizures than [those] required by the Federal Constitution,' even if the state constitutional

provision is similar to the Fourth Amendment." *State v. Benoit*, R.I., 417 A.2d 895, 899 (1980) (quoting *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730, 734 (1967)).

Article I, sec. 6, of our constitution states that

"[t]he right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but on complaint in writing upon probable cause, supported by oath or affirmation, and describing as nearly as may be, the place to be searched, and the persons or things to be seized."

In interpreting this section, we have previously recognized our right to "establish a higher standard of protection [for a criminal defendant] than [that which he] might otherwise be afforded under the [F]ourth [A]mendment." *State v. Ahmadjian*, R.I., 438 A.2d 1070, 1082 (1981) (quoting *State v. Luther*, 116 R.I. 28, 29, 351 A.2d 594, 595 (1976)); *State v. Maloof*, 114 R.I. 380, 389, 333 A.2d 676, 681 (1975). We have exercised this right to require stricter compliance with the provisions of our electronic eavesdropping statute than the Fourth Amendment requires of a nearly identical federal statute, *see State v. Maloof*, 114 R.I. at 389-91, 333 A.2d at 681-82, and to afford greater protections than those provided under the Fourth Amendment to a criminal defendant whose automobile has been subjected to a warrantless search and seizure. *State v. Benoit*, R.I., 417 A.2d at 900-01.

Our decisions to afford additional protections against unreasonable searches and seizures to a criminal defendant under art. I, sec. 6, beyond those provided to him under the Fourth Amendment comports fully with our state's early legislative enactment of the exclusionary rule. On May 5, 1955, the exclusionary rule became the law of the State of Rhode Island with the

enactment of P.L.1955, ch. 3590, § 1.[15] This law was enacted six years before the exclusionary rule was made mandatory upon the states through the Fourth and Fourteenth Amendments, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and reflects our legislature's clear intention to provide independent vitality to art. I, sec. 6, in guarding the privacy interests of the citizens of this state.

 Public Laws 1955, ch. 3590, § 1 was our legislature's immediate response to a prior holding of this court. In *State v. Olynik,* 83 R.I. 31, 113 A.2d 123 (1955), it was held that art. I, sec. 6, of our constitution did *not* require the suppression of evidence that was obtained in an illegal search. The enactment of G.L.1956 (1969 Reenactment) § 9–19–25 within only six weeks of the *Olynik* decision effectively reversed this result once and for all in Rhode Island.

In *Benoit* we invalidated the warrantless search of an automobile which took place four hours after it had become immobile. In that case, we held that art. I, sec. 6, reflects the intent of the framers of our constitution to declare all warrantless searches and seizures unreasonable. *State v. Benoit,* R.I., 417 A.2d at 901. "Only if circumstances render procurement of a warrant impracticable, and if the needs of society demand swift action, does art. I, sec. 6 permit the temporary limited infringement of an individual's right of privacy." *Id.* We stated further in *Benoit* that once the vehicle had lost its mobility, defendant's privacy interest had regained its paramount importance and should not have been infringed upon without the authorization of a neutral magistrate. *Id.*

In the case at bar, an even greater period of immobility than that present in *Benoit* had elapsed between the state's initial warrantless "seizure" of evidence and its subsequent search. The black bag and its

contents were delivered to the State Police on March 13, 1981. At that time, this evidence was completely and exclusively under the control of the State Police. It remained under that agency's total dominion in a locked evidence room until its subsequent chemical analysis. The toxicological examinations did not occur until March 20, 1981. By March 20, 1981, the black bag and its contents had been fully immobile for one week.

Under these circumstances, it is hard to conceive of a more practicable situation in which to obtain a warrant. The evidence was fully at rest in the state's hands. "[T]he needs of society [did not] demand swift action * * * and the [defendant's] privacy interest had regained its paramount importance." *Id.* The state's failure to procure a search warrant here consequently cannot withstand constitutional scrutiny. The admission of such evidence by the trial justice was therefore error.

## IV

One final comment is in order in response to the Chief Justice's concurrence in which he concludes that the trial justice erroneously denied defendant's motion for judgment of acquittal on count 1 of the indictment. My brethren—Justices Kelleher, Weisberger, and Shea—and I see no such error in the denial of this motion.

 In considering a motion for a judgment of acquittal, the trial justice and this court on review, are bound to consider only that evidence that the prosecution claims is capable of generating proof beyond a reasonable doubt. As such evidence is to be viewed in the light most favorable to the prosecution, the trial justice and the reviewing court must draw from such evidence all reasonable inferences that are consistent with the accused's guilt. At this juncture, neither the weight

---

**15.** Public Laws 1955, ch. 3590, § 1 provides in pertinent part that "no evidence shall be admissible where the same shall have been procured, by, through or in consequence of any illegal search and seizure as prohibited in section 6 of article I of the constitution of the state of Rhode Island."

of the evidence nor the witnesses' credibility are to be considered. *State v. Romano,* R.I., 456 A.2d 746, 756–57 (1983). When considering such a motion, the appellate court, as well as the trial court, is bound to look at all such evidence without regard to whether it was properly admitted into evidence. *State v. Maloney,* 111 R.I. 133, 139, 300 A.2d 259, 262–63 (1973).

▮ Applying these principles to the evidence, we would first point to the testimony of Dr. George F. Cahill, a member of the faculty at Harvard University School of Medicine. He told the jury that the sole cause of both the 1979 and the 1980 Christmastime comas was the external injection of insulin into the body of defendant's wife.

Maria, the maid, told the jury that defendant was thoroughly familiar with syringes and hypodermic needles, which he used to inject himself with vitamins, and had at one time given his wife an injection of vitamins. The maid also testified that when defendant described his wife's activities on the afternoon of December 27, 1979 to a doctor, he lied.

Ample testimony was presented indicating that during the 1979 Christmas visitation to Clarendon Court defendant had the opportunity to be alone with his wife in her bedroom.

One of the witnesses for the prosecution was the "other woman" in defendant's life, Alexandra Isles. In 1979 she was living in New York City, was divorced, and was by her own admission well off financially. She had met defendant in April 1978, and by March 1979 their relationship, in her words, had become "intimate." During the spring of 1979, the couple began speaking in terms of marriage, and defendant was given six months in which he was both to obtain a divorce and be married to Alexandra. The absolute beginning of the six-

month period is somewhat indefinite, but the time limit could have been up at the start of December.

With all due deference to the Chief Justice, we believe that when one views the evidence to which we have just alluded in light of the principles enumerated earlier, the reasonable inferences drawn from such evidence support a reasonable conclusion that in late December 1979 the defendant, mindful of the ultimatum of his intended bride, decided to take matters into his own hands, one of which held a syringe containing a copious quantity of insulin, and so injected the contents of the syringe into his wife with the intent that she should expire so that he would be free to marry Alexandra.

V

For the reasons stated, the the defendant's appeal is sustained, the judgment of conviction appealed from is vacated, and the case is remanded to the Superior Court for a new trial on both counts.

BEVILACQUA, Chief Justice, concurring in part and dissenting in part.

I concur with my colleagues with respect to the issues considered. However, I am of the opinion that the trial justice erred in not granting defendant's motion for a judgment of acquittal on the first count of the indictment.

In considering a motion for a judgment of acquittal,[16] the trial justice must review the evidence in a light most favorable to the state, drawing all reasonable inferences therefrom consistent with the defendant's guilt. The trial justice may consider neither the weight of the evidence nor the credibility of the witnesses. *E.g., State v. Austin,* R.I., 462 A.2d 359, 364 (1983);

---

**16.** The state argues that because defendant did not object to the omission of an instruction on inference stacking, the rule of the law of the case bars our review of this issue. This argument is without foundation. When a court properly instructs a jury on the standards of reasonable doubt, no further instruction on in-ference stacking is necessary. *See State v. Roddy,* R.I., 401 A.2d 23, 35 (1979). A challenge to the sufficiency of the evidence is properly made by a motion for a judgment of acquittal. On appeal we are bound by the same standards as the trial justice. *State v. Collazo,* R.I., 446 A.2d 1006, 1011 (1982).

*State v. Armstrong*, R.I., 446 A.2d 1043, 1044 (1982). If the evidence fails to establish the defendant's guilt beyond a reasonable doubt, the trial justice must grant the motion. *State v. Gazerro*, R.I., 420 A.2d 816, 827 (1980). On appellate review, this court is bound by the same standards as the trial justice. *State v. Collazzo*, R.I., 446 A.2d 1006, 1011 (1982).

An assault is an "unlawful attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness." *State v. Baker*, 20 R.I. 275, 277, 38 A. 653, 654 (1897); *see also State v. Pope*, R.I., 414 A.2d 781, 788 (1980). In order to establish the offense of assault with intent to murder, the state also had to prove that defendant had the specific intent to kill his wife. *State v. Fournier*, R.I., 448 A.2d 1230, 1233 (1982). The state need not prove an express intent to kill; a defendant's conduct may establish the requisite legal malice for a jury to infer an intent to kill. *State v. Charette*, R.I., 434 A.2d 280, 283 (1981); *see State v. McGranahan*, R.I., 415 A.2d 1298, 1302 (1980).[17] However, in order to meet its burden, the state had to prove every element of the offense of assault with intent to murder beyond a reasonable doubt. *State v. Roddy*, R.I., 401 A.2d 23, 35 (1979).

Moreover, we have said that no valid distinction exists between the probative force of direct and of circumstantial evidence. Any fact established by circumstantial evidence must be established as sufficiently and as completely as by positive, direct evidence. *State v. Roddy*, R.I., 401 A.2d at 35; *State v. Rose*, 112 R.I. 402, 407, 311 A.2d 281, 284 (1973). In any case, the state meets its burden when all evidence, direct or circumstantial, and all legitimate and reasonable inferences drawn therefrom, establish a defendant's guilt beyond a reasonable doubt. *State v. Gazerro*, R.I., 420 A.2d at 828.

In addressing this issue, there is no need to repeat all the evidence recited in the majority opinion.

Reviewing the evidence in a light most favorable to the state, I believe that the state failed to sustain its burden of proof in regard to count 1. An examination of the record reveals that the state relied upon two basic inferences to establish defendant's guilt: the two comas suffered by Martha von Bulow and the existence of a black bag that at various times was found to contain insulin and syringes.[18] The evidence revealed that on the evening of December 26, 1979, Martha von Bulow became weak and uncoordinated and had to be escorted to her bedroom, where she remained alone with defendant. The next morning, after noticing that Mrs. von Bulow had not awakened at her usual hour, Miss Schrallhammer attempted to check on her but was advised by defendant that Mrs. von Bulow had a sore throat and should not be disturbed. Nonetheless, Miss Schrallhammer checked on Mrs. von Bulow and was unable to arouse her. The defendant, nevertheless, failed to call a doctor until several hours later, at which time he failed to describe her condition adequately. Miss Schrallhammer felt that the statements made by defendant to the doctor that his wife was an alcoholic, had been drinking the night before, and had been out of bed earlier that day were "not true." Four hours subsequent to the first call, defendant again telephoned the doctor and requested that he come to the house. Doctor Gailitis found Mrs. von Bulow in a comatose state. Shortly after his arrival, Mrs. von Bulow experienced cardiac arrest and

---

17. Malice is "an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life." *State v. McGranahan*, R.I., 415 A.2d 1298, 1302 (1980).

18. On appeal, defendant challenged the sufficiency of the evidence by asking us to review all of the evidence presented at trial. The defendant, however, misconceives the nature of a motion for a judgment of acquittal. The "sole target" of review is the sufficiency of the evidence upon which the state relies to establish a defendant's guilt. *State v. Crescenzo*, 114 R.I. 242, 257, 332 A.2d 421, 430 (1975).

had to be resuscitated by the doctor. Some medical testimony revealed that the cause of the coma was exogenous insulin.[19]

Because there is no direct evidence of defendant's guilt, the state had to prove its case by the use of circumstantial evidence. The state also had to rely upon a pyramiding of inferences to establish defendant's guilt. From the facts presented, the prosecution asked the jury to draw two primary inferences: that both comas were caused by exogenous insulin and that the black bag and its contents belonged to defendant. From these primary inferences, the jury was asked to draw the secondary inference that defendant was guilty of assault with intent to murder.

It is well settled that if an inference is the only reasonable one to be drawn from the established facts, then a secondary inference may be drawn from the primary inference. However, when the facts from which it is drawn are susceptible of another reasonable inference, it must be rejected as lacking probative force. *In re Derek*, R.I., 448 A.2d 765, 768 (1982); *Waldman v. Shipyard Marina, Inc.*, 102 R.I. 366, 373–74, 230 A.2d 841, 845 (1967). "In this way the ultimate inference rests upon a foundation that logically has the probative force of established fact; were it otherwise, the ultimate conclusion * * * would rest on no more than conjecture and surmise." *Carnevale v. Smith*, R.I., 404 A.2d 836, 841 (1979). To simplify this principle, the underlying, proven facts exclusively support the primary inferences, which support the secondary inferences in the same manner that each level of a pryamid supports the level immediately above it.

In regard to the second coma, the facts viewed in a light most favorable to the state support the primary inferences that the coma was caused by exogenous insulin and that the black bag and its contents

belonged to defendant. From these inferences, the secondary inference that defendant injected his wife with insulin may be drawn.

It is my opinion that the state failed to sustain its burden of proof on count 1. Unlike the facts surrounding the second coma, no "black bag" was involved in the first coma. Maria Schrallhammer testified that she first discovered the bag in February 1980. Indeed, insulin and needles were not seen until November 1980—almost eleven months after the first coma. The state cannot use facts supporting count 2 to establish the element of assault in count 1.

The state itself referred to the bag and its contents as the "key" to this case. Nevertheless, because the existence of the black bag and its contents cannot be established until November of 1980, this fact cannot serve to establish the inference that the defendant owned these items at the time of the first coma. Without this inference as its foundation, the secondary inference of guilt must fall. Accordingly, the defendant's guilt is not an exclusive inference to be drawn from the facts. The facts surrounding count 1 at most support a conclusion that the defendant acted in an unhusbandlike, rather than in a criminal, manner. I can only conclude that his conviction rests, not upon proof beyond a reasonable doubt, but upon speculation and conjecture. *See State v. Alexander*, R.I., 471 A.2d 216, 219 (1984).

I would therefore sustain the defendant's appeal in regard to count 1 of the indictment, vacate the judgment of conviction, and remand to the Superior Court with direction to enter a judgment of acquittal on count 1.

## ORDER

After our opinion in the above case was published, the state filed a petition to rear-

---

**19.** Medical opinions concerning the cause of Martha von Bulow's comas were elicited through the use of hypothetical questions posed to medical expert witnesses. The state concedes that the hypothetical question posed to its primary expert, Dr. Cahill, was factually erroneous regarding the time of one of the glucose pushes. In the context of my analysis of this issue, however, I shall assume that this erroneous information did not influence Dr. Cahill's conclusion.

gue. We have carefully considered the reasons upon which the petition is based, and we are of the opinion that only one reason deserves any comment, and none of the reasons warrant a reargument.

The court in its opinion faulted the State Police for their failure to obtain a search warrant before the police forwarded a collection of "tranquilizing and anesthetic drugs" found in the defendant's black bag to the state toxicologist for examination and analysis. Through inadvertence, the court included within its description of the collection the following: "10. One blue pill marked Valium Roche-10 found to contain diazepam (Valium)." Concededly, this particular pill was obtained by the State Police on April 21, 1981, while searching, with the defendant's consent, the family's Newport home. However, this oversight in no way justifies the failure to obtain a warrant before the other nine items were sent to the toxicologist.

For purposes of achieving clarity, the opinion which precedes this order has been revised in conformity with this response before the print goes to press.

The petition for reargument is denied.